555 A.2d 1264

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Kevin HUGHES, Appellant.**

Supreme Court of Pennsylvania.

Submitted Jan. 19, 1988.

Decided March 13, 1989.*

* This decision was considered and rendered prior to March 7, 1989.

424

McDermott, J., filed a concurring opinion in which Larsen and Papadakos, JJ., joined.

426

428

Nino Tinari, Philadelphia, for appellant.

Gaele McLaughlin Barthold, Deputy Dist. Atty., Ronald Eisenberg, Chief, Appeals Div., Maxine Stotland, Philadelphia, and Robert A. Graci, Chief Deputy Atty. Gen., for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA, PAPADAKOS and STOUT, JJ.

## OPINION OF THE COURT

STOUT, Justice.

This direct appeal[1] arises from the conviction and death sentence of Kevin Hughes (Appellant) for murder of the first degree, rape, involuntary deviate sexual intercourse, and arson endangering persons.[2] Appellant, who was sixteen years, eleven months, and twenty-four days old at the time of the crimes, was arrested on January 12, 1980, for the March 1, 1979 killing of nine-year-old Rochelle Graham. After pre-trial motions were denied on February 13, 1981, Appellant was tried by a jury before the Honorable Robert Latrone of the Court of Common Pleas of Philadelphia County, who also sat as the Suppression Court. On March 23, 1981, the jury convicted Appellant, and, at the sentencing proceeding,[3] determined that Appellant should be sentenced to death on the murder conviction. Counsel argued post-trial motions, which the Trial Court denied on October 27, 1983. The Trial Court sentenced Appellant to death on

---

**1.** 42 Pa.Cons.Stat.Ann. § 9711(h) (Purdon 1982) provides:

(h) *Review of death sentence—*
(1) A sentence of death shall be subject to automatic review by the Supreme Court of Pennsylvania pursuant to its rules.

(2) In addition to its authority to correct errors at trial, the Supreme Court shall either affirm the sentence of death or vacate the sentence of death and remand for the imposition of a life imprisonment sentence.

(3) The Supreme Court shall affirm the sentence of death unless it determines that:
(i) the sentence of death was the product of passion, prejudice or any other arbitrary factor;
(ii) the evidence fails to support the finding of an aggravating circumstance [elsewhere specified]; or
(iii) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant.

**2.** 18 Pa.Cons.Stat.Ann. § 2502(a) (Purdon 1983) (first degree murder); *Id.* § 3121 (rape); *Id.* § 3123 (involuntary deviate sexual intercourse); *Id.* § 3301(a) (arson endangering persons).

**3.** 42 Pa.Cons.Stat.Ann. § 9711(a)(1) (Purdon 1982) provides:

(a) *Procedure in jury trials—*
(1) After a verdict of murder of the first degree is recorded and before the jury is discharged, the court shall conduct a separate sentencing hearing in which the jury shall determine whether the defendant shall be sentenced to death or life imprisonment.

the conviction for murder of the first degree, and to two concurrent sentences of ten to twenty years for rape and involuntary deviate sexual intercourse to run consecutively to the death penalty.[4] This direct appeal followed.

Appellant challenges the verdicts below on numerous grounds. An analysis of Appellant's contentions, as well as an independent review of the sufficiency of the evidence in this death sentence case, as required by *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 26 n. 3, 454 A.2d 937, 942 n. 3 (1982), *cert. denied sub nom., Pennsylvania v. Zettlemoyer*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983), compels us to affirm Appellant's murder conviction and to uphold the sentence of death.

## SUFFICIENCY OF THE EVIDENCE

The test for the sufficiency of the evidence in a criminal case is whether the evidence is sufficient to prove every element of the crime beyond a reasonable doubt. *See Commonwealth v. Harper*, 485 Pa. 572, 403 A.2d 536 (1979). In making this determination, the reviewing court must view the evidence in the light most favorable to the Commonwealth as the verdict winner, and accept as true all evidence and all reasonable inferences therefrom upon which, if believed, the fact finder properly could have based its verdict. *Commonwealth v. Davis*, 491 Pa. 363, 421 A.2d 179 (1980).

The evidence adduced at trial discloses the following. On March 1, 1979, at about 10:30 a.m., authorities responded to a fire alarm at an abandoned building at 1617 Olive Street in Philadelphia. Detective Boyle of the Philadelphia Police Department testified that upon entering the third floor bedroom, he observed the body of Rochelle Graham laying on the floor. Her body was on its back in a spread-eagle fashion. The body was badly burned, with a partially burned pillow between its legs. There was a strong odor of burnt flesh in the room. N.T. at 99. The letters "PEA" were burned into the ceiling. *Id.* at 104–05.

4. The Court suspended sentence for arson endangering persons.

The Commonwealth then called Captain William Shirar, Assistant Fire Marshal of the City of Philadelphia. He testified that the fire was of incendiary origin, and that it had been set to the combustibles on top of the victim. *Id.* at 327, 332.

Dr. Robert L. Catherman, Deputy Medical Examiner for Philadelphia, testified that he conducted an external examination of the body at 4:10 p.m. on March 1, 1979. He discovered bloody and pink fluid and mucus at the nose area and in the mouth, and general thermal burns of the body. *Id.* at 944–45. The body also showed bruising and superficial surface tearing of the soft tissues in the region of the vaginal opening. In addition, the body had fecal matter protruding from the anus, and there were bruises and tearing of the superficial areas at the anal opening that extended three inches into the anal canal. An internal examination showed soft tissue bruising in the neck with no indication of smoke inhalation. *Id.* at 945, 948. Dr. Catherman concluded that the injuries were consistent with attempted penetration of the vagina and actual penile penetration of the rectum. He further concluded that Ms. Graham died from manual strangulation, and that the manner of death was homicide. *Id.* at 952–54.

The Graham homicide went unsolved for approximately ten months.

Marie Oquendo, who was thirteen years old at the time of trial, then testified that around noon on January 5, 1980, Kevin Hughes grabbed her from behind, pushed her into a vacant house, and took her to a second floor bedroom. There, Hughes ordered her to undress and forced her to perform oral sex. He stomped on her face, then grabbed her from behind, and tried to choke her. She passed out and awoke in a closet a few minutes later. N.T. at 1079–89.

Detective John Chidester of the Central Detective Division of the Philadelphia Police Department, testified to the events on January 10–12, 1980. He stated that, accompanied by Homicide Detectives Frank O'Brien and Andrew English, he visited the home of Marie Oquendo. There he

conducted a photo array, which included a picture of Appellant. Ms. Oquendo identified Appellant as her assailant.

The same day, Detective Chidester obtained an arrest warrant against Appellant for rape, attempted murder, and other charges stemming from the Oquendo incident. The next day, January 11, 1980, at 6:53 a.m., he executed this warrant by taking Appellant into custody from the third floor bedroom of his residence. While there, police personnel observed the name "PEANUT" burned into the ceiling of Appellant's bedroom.

Since Appellant was a juvenile, Detective Chidester requested that Mary Hawthorne, Appellant's grandmother, accompany Appellant and police personnel to police headquarters. She refused to go, but requested that thirty-three-year-old Edward Hawthorne and twenty-year-old Morris Hawthorne, her sons and Appellant's uncles, join Appellant at police headquarters.

From 7:30 a.m. to 8:00 a.m., before the uncles' arrival at police headquarters, Detective Ligato interviewed Appellant in order to obtain background information pertaining to his age, residence, date of birth, education, and other matters unrelated to the criminal charges resulting from the Oquendo incident for which he had been arrested. Subsequently, Morris and Edward Hawthorne arrived. From 8:50 a.m. to 9:00 a.m., both uncles conferred with Appellant concerning the Oquendo charges. At that time, Appellant and his uncles were advised of Appellant's *Miranda* rights. From 9:10 a.m. to 9:55 a.m., Appellant gave a confession in the presence of his two uncles wherein he fully admitted the sexual assault and related crimes inflicted on Marie Oquendo. After Detective Ligato had completed a contemporaneous written memorandum of Appellant's oral confession, Edward Hawthorne read it in full to Appellant and Morris Hawthorne.

At about 10:00 a.m., Detectives O'Brien and English, noting the similarities between the Oquendo and Graham incidents, stated that they would like to question Appellant about the Graham homicide. After he and his uncles were

advised of his *Miranda* rights, Appellant furnished the detectives with an oral exculpatory statement. At about 11:00 a.m., the detectives requested that Appellant take a lie detector test because they doubted the veracity of the exculpatory statement. Appellant and his uncles agreed to the test. While in the polygraph room, Detective O'Brien again advised Appellant, in the presence of his uncle, Edward Hawthorne, of his *Miranda* rights. At the conclusion of the test,. the polygraphist advised the detective that Appellant had failed. Detective O'Brien then advised Appellant and his uncle of the results.

From 12:25 p.m. to 12:35 p.m., all of the parties in the interview room prodded Appellant to tell the truth. Both uncles told him that "[i]f you did it Kevin, tell them." N.T. Suppression Hearing at 445. Detective O'Brien stated, "[i]f you did it, how many more little kids are you going to hurt?" *Id.* From 12:35 p.m. to 12:45 p.m., Appellant orally admitted that he had sexually assaulted and killed Rochelle Graham on March 1, 1979. These admissions subsequently were transcribed, and Edward Hawthorne read the transcription aloud to Appellant. This reading was tape recorded. At 1:00 p.m., the police transported Appellant to the Youth Study Center. The actual time at which he arrived at the Center does not appear in the record.

In the late evening of January 11, 1980, Detective English, armed with the confession, obtained an arrest warrant for Appellant for the murder of Rochelle Graham. At or about 9:30 a.m. the next day, January 12, 1980, Detective English visited Appellant's residence for the purpose of informing Morris and Edward Hawthorne that Appellant actually was to be arrested for the Graham homicide. Morris Hawthorne, but not Edward Hawthorne, was present at the residence. Detective English transported Morris Hawthorne to the Police Administration Building. At 2:15 p.m., the police picked up Appellant from the Youth Study Center and transported him to police headquarters, where they arrived at 2:25 p.m. After the police read Appellant and his uncle his *Miranda* warnings, Appellant and his uncle sub-

mitted to police interrogation concerning the Graham incident. Between 2:45 p.m. and 5:05 p.m., Appellant again confessed that he had sexually assaulted and killed Rochelle Graham. From 5:05 p.m. to 5:45 p.m., and again from 6:10 p.m. to 6:40 p.m., Morris Hawthorne read the entire contents of Appellant's confession to him. The second reading was interrupted at 6:35 p.m. when Edward Hawthorne arrived at the interview room and questioned the veracity of Appellant's confession and the authority of Morris Hawthorne to have assisted Appellant in making it. At 7:49 p.m. on January 12, 1980, Appellant was arraigned.

■ We believe that this evidence was sufficient to support the first degree murder conviction. 18 Pa.Cons.Stat. Ann. § 2502(a) (Purdon 1983). Appellant's confession, as well as the similarities between this crime and the Oquendo rape, *see infra,* sufficiently established his identity as the perpetrator of the crime. Moreover, the nature of the attack, manual strangulation, as well as the attempt to destroy the body by fire, evince an intentional, premeditated killing. *Commonwealth v. Dollman,* 518 Pa. 86, 541 A.2d 319 (1988).

## COMPETENCY TO STAND TRIAL

In challenging his convictions, Appellant first argues that the Trial Court erred in finding him competent to stand trial. The facts pertinent to the competency issue are as follows. On October 21, 1980, a competency hearing was held before the Honorable Berel Caesar. Dr. William Levy testified for the Commonwealth that it was his opinion that Appellant was competent to stand trial. Dr. Levy stated that he and his staff had conducted a joint examination of Appellant a few weeks before the hearing. Based on almost daily contact, extensive psychiatric evaluations, and his behavior, Dr. Levy opined that Appellant had the mental capacity and ability to comprehend the charges against him and to cooperate with counsel in his defense. The doctor further opined that Appellant was able to understand the roles that the judge, the defense attorney, the prosecutor,

the jury, and the witnesses play in a criminal trial. N.T. Competency Hearing at 9–18. Judge Caesar ruled that Appellant was competent to stand trial.

On the day of the suppression hearing, Appellant again raised the competency issue. Judge Latrone ordered that Dr. Edwin P. Camiel, a psychiatrist employed by the City of Philadelphia, examine Appellant. Dr. Camiel testified that in his opinion Appellant was competent to stand trial. Judge Latrone then ordered a private psychiatrist to examine Appellant. Dr. Robert Blumberg examined him, and concluded that he was incompetent to stand trial.

Due to these conflicting opinions, Judge Latrone ordered another competency examination. Dr. Richard Saul, a psychiatrist employed by the City of Philadelphia, examined Appellant and concluded that he was competent to stand trial. Judge Latrone also questioned Appellant in detail about his name, age, date of birth, recognition of both his lawyer and the assistant district attorney, their adverse positions at trial, and the charges against him. He was satisfied that Appellant "knows where he is, why he is here, and when he is here." N.T. Suppression Hearing at 26. The Judge then ruled that Appellant was competent to stand trial.

This Court, in *Commonwealth ex rel. Hilberry v. Maroney*, 424 Pa. 493, 227 A.2d 159 (1967), articulated the test for determining whether one is competent to stand trial:

[T]he test to be applied in determining the legal sufficiency of [a defendant's] mental capacity to stand trial ... is ... his ability to comprehend his position as one accused of murder and to cooperate with his counsel in making a rational defense. See *Commonwealth v. Moon*, [383 Pa. 18, 117 A.2d 96 (1955)] and *Commonwealth ex rel. Hilberry v. Maroney*, [417 Pa. 534, 207 A.2d 794 (1965)]. Or stated another way, did he have sufficient ability at the pertinent time to consult with his lawyers with a reasonable degree of rational understanding, and have a rational as well as a factual understanding of the proceedings against him. See *Dusky v. United States*, 362

U.S. 402 [80 S.Ct. 788, 4 L.Ed.2d 824] (1960). Otherwise the proceedings would lack due process: *Bishop v. United States*, 350 U.S. 961 [76 S.Ct. 440, 100 L.Ed. 835] (1956).

*Id.*, 424 Pa. at 495, 227 A.2d at 160. *See* 50 Pa.Stat.Ann. § 7402(a) (Purdon Supp.1988). *See also Commonwealth v. Banks*, 513 Pa. 318, 521 A.2d 1, *cert. denied sub nom.*, *Banks v. Pennsylvania*, 484 U.S. 873, 108 S.Ct. 211, 98 L.Ed.2d 162 (1987); *Commonwealth v. Sourbeer,* 492 Pa. 17, 422 A.2d 116 (1980); *Commonwealth v. Davis*, 459 Pa. 575, 330 A.2d 847 (1975). The defendant has the burden to establish his lack of competence by clear and convincing evidence. 50 Pa.Stat.Ann. § 7403(a) (Purdon Supp.1988); *Commonwealth v. Banks, supra,* 513 Pa. at 341, 521 A.2d at 12. Moreover, the determination of competency rests in the sound discretion of the trial court. *Id.*

█ Appellant argues that Judge Caesar abused his discretion by finding him competent. He first argues that Dr. Levy, at the time of his evaluation, did not possess earlier reports that had concluded that Appellant was incompetent. These reports, however, were prepared six months before the competency hearing, and are not dispositive of the competency issue immediately before and during the trial. *See Commonwealth v. Garnett*, 336 Pa.Super. 313, 485 A.2d 821 (1984); *Commonwealth v. Knight*, 276 Pa.Super. 348, 419 A.2d 492 (1980); *Commonwealth v. Hunt*, 259 Pa.Super. 1, 393 A.2d 686 (1978).

█ Appellant next asserts that this Court should believe the testimony of Dr. Blumberg that he was incompetent. Essentially, Appellant asks us to overstep our role as a reviewing court, which we decline to do. The Trial Court explained its rejection of this testimony, stating, "this court assigned no weight and credibility to Dr. Blumberg's expert opinion as to competence since it was based on contradictory factual conclusions and possibly biased motives." Trial Ct. slip op. at 17. Where the record reveals that the Commonwealth's witnesses were familiar with Appellant's condition, and where they had sufficient information upon

which to base their opinions, the Trial Court does not err in choosing to accept their opinions rather than those of the defendant's experts. *Commonwealth v. Banks, supra* (no error where expert testimony conflicts if finding of competency adequately supported by record). *See also Commonwealth v. Powell,* 293 Pa.Super. 463, 439 A.2d 203 (1981); *Commonwealth v. Knight, supra.* The testimony of the two medical experts and the testimony of the Appellant constituted sufficient evidence of Appellant's competency.

■ Appellant next argues that he was incompetent to stand trial because he was taking the medications thorazine and elanil as a treatment for his mental disorder. The record revealed that he was taking a conservative amount of these medications. N.T. Competency Hearing at 23–24. Moreover, the fact that one is taking medication is, by itself, insufficient to establish incompetence. *See Commonwealth v. Long,* 310 Pa.Super. 339, 456 A.2d 641 (1983) (taking medication did not render defendant incompetent to plead guilty); *Commonwealth v. Scott,* 271 Pa.Super. 545, 414 A.2d 388 (1979) (same). Although the drugs were prescribed as an anti-depressant, nowhere in the record is there any evidence that his medication diminished, rather than sustained, his level of competence. *See Commonwealth v. Tyson,* 485 Pa. 344, 402 A.2d 995 (1979) (taking medication supported finding of competence).

■ Finally, Appellant argues that he necessarily was incompetent since Dr. Saul diagnosed him as a schizophrenic. Dr. Levy, however, diagnosed him as a schizoid personality, which he described as meaning not a major mental illness, i.e., a psychosis. In any event, a mental or physical disorder must interfere with one's ability to understand the proceedings or to assist counsel before it is sufficient to constitute incompetency. *Commonwealth v. Martinez,* 498 Pa. 387, 446 A.2d 899 (1982); *Commonwealth v. Epps,* 270 Pa.Super. 295, 411 A.2d 534 (1979). There was sufficient evidence in the record to support the conclusion that Appellant's mental disorder did not impair

438

his competence to stand trial. Therefore, the Trial Court did not abuse its discretion.

## PROBABLE CAUSE TO ARREST

Appellant argues that the Trial Court erred in not granting his motion to suppress identification evidence, since, according to Appellant, the police did not have probable cause to arrest him for the January 5, 1980, rape of Marie Oquendo.[5] This Court, in *Commonwealth v. Starks*, 484 Pa. 399, 399 A.2d 353 (1979), stated the standard of judicial review for determining the correctness of a suppression court's factual findings and legal conclusions:

"Our responsibility on review is 'to determine whether the record supports the factual findings of the court below and the legitimacy of the inferences and legal conclusions drawn from findings.' *Commonwealth v. Goodwin*, [460 Pa. 516, 521, 333 A.2d 892, 895 (1975)]; see *Commonwealth v. Bundy*, 458 Pa. 240, 328 A.2d 517 (1974). In making this determination, this Court will consider only the evidence of the prosecution's witnesses and so much of the evidence for the defense as, fairly read in the context of the record as a whole, remains uncontradicted. See *Culombe v. Connecticut*, [367 U.S. 568, 604, 81 S.Ct. 1860, 1880, 6 L.Ed.2d 1037 (1961)]; *Commonwealth v. Goodwin, supra*, 460 Pa. at 521, 333 A.2d at 895; *Commonwealth ex rel. Butler v. Rundle, supra*, [429 Pa. 141, 149–50, 239 A.2d 426, 430 (1968)]" *Commonwealth v. Kichline*, 468 Pa. 265, 280–81, 361 A.2d 282, 290 (1976).

5. The probable cause for the arrest warrant states:
On 1-5-79 on the highway Corthinian & Parrish sts one Maria OQUENDO His female 12 yrs 763 N. Corthinian St was dragged off the highway into a vacant house by a negro male who beat her, raped her, tried to kill her and robbed her. She stated she has seen this negro male visiting other people in her apt bld the last few years and can positively identify him. She does not know his name. On 1-10-80 the victim was shown a group of 12 photos by the assigned and she picked out a photo of KEVIN HUGHES and stated he positivly the man who attacked her and the same one she had seen previously in her apt bldg visiting others.
Exhibit C-3.

In *Commonwealth v. Willis*, 483 Pa. 21, 394 A.2d 519 (1978), this court further defined the standard:

"First, the standard of review, [Kichline standard] which we are asked to apply is that which is used '[w]here there are no explicit findings, or in the case of lacunae among the findings,' *Commonwealth v. Sparrow*, 471 Pa. 490, 498 n. 5, 370 A.2d 712, 716 n. 5 (1977).... We are bound to accept such explicit findings of fact unless they are wholly lacking in support in the evidence. *Commonwealth v. Sparrow, supra*, 471 Pa. at 498 n. 5, 370 A.2d at 716 n. 5 (Footnote omitted.)"

*Commonwealth v. Starks*, 484 Pa. at 403–04, 399 A.2d at 355. *See also Commonwealth v. Lark*, 505 Pa. 126, 477 A.2d 857 (1984); *Commonwealth v. Granger*, 364 Pa.Super. 453, 528 A.2d 244 (1987).

Appellant notes that Detective Joseph Talone testified that he received a telephone call from Dennis Ortiz, the owner of the store from which Marie Oquendo had left just prior to being raped. Ortiz informed the detective that he had heard a rumor that Appellant was the perpetrator. N.T. Suppression Hearing at 269–70. Detective Talone further testified that he neither asked Ortiz how he knew this information nor checked the source of the rumor for reliability. *Id.* at 270–71. In addition, he testified that he did not know Ortiz prior to this incident. *Id.* at 271. Citing *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), Appellant argues that this putative "informer" was insufficiently reliable to support a finding of probable cause.

In challenging the sufficiency of the probable cause, Appellant misconstrues the relevant inquiry by focusing on the source of the information that led the police to secure his photograph. Of course, unsubstantiated rumors alone cannot be the basis for probable cause. *Spinelli, supra.* Such was not the case here. Once Ms. Oquendo, who knew Appellant from the neighborhood, N.T. at 1079, identified him as her attacker from the photo array, probable cause

existed for his arrest. *Commonwealth v. Hardcastle,* 519 Pa. 236, 546 A.2d 1101 (1988). Therefore, the fact that the police initially acted on an unsubstantiated rumor became irrelevant once adequate probable cause arose.[6]

■ Appellant further challenges his identification as the rapist of Marie Oquendo on the grounds that the pre-trial photographic identification procedure was unduly suggestive. A pictorial identification is unduly suggestive when it gives rise to a substantial likelihood of irreparable misidentification. *See Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); *Commonwealth v. Fowler,* 466 Pa. 198, 352 A.2d 17 (1976); *Commonwealth v. Wojtczak,* 342 Pa.Super. 306, 492 A.2d 1133 (1985). The Commonwealth has the burden of proving that the photographic identification procedure was not suggestive. *See Commonwealth v. Cooper,* 333 Pa.Super. 559, 482 A.2d 1014 (1984).

Detective Chidester testified that he took twelve photographs of young, black males, including one of Appellant, to Marie Oquendo's home. N.T. Suppression Hearing at 122–23. He testified that he placed the photographs on the kitchen table in four rows of three and that Ms. Oquendo placed her hand on Appellant's photograph and said that he was the one who hurt her. *Id.* at 125. Appellant argues that since the detective and Ms. Oquendo differed in their testimony as to the manner in which the police conducted the identification procedure, the identification was tainted. Specifically, Ms. Oquendo testified that the detective handed her the photographs in a stack, like a deck of cards, and she fingered through them one at a time. *Id.* at 2.437. She further testified that after looking through them once she

6. In concluding that the police had probable cause to arrest Appellant on January 11, 1980, we believe that Appellant's derivative argument, namely, that his arrest on January 12, 1980 for the killing of Rochelle Graham was tainted due to the illegal prior arrest, must fail. Moreover, the police, in light of the similarities between the two crimes and Appellant's confession to the Graham incident on January 11, 1980, had sufficient probable cause to arrest him for that crime.

did not recognize her attacker and that the police prompted her to go through the stack again. *Id.*

Such inconsistencies in testimony, however, do not provide the basis for suppression. The Suppression Court had the prerogative to believe none, all, or part of the testimony, and this fact-finding function included the duty of determining the weight and credibility of such testimony. *See Commonwealth v. Tucker*, 461 Pa. 191, 335 A.2d 704 (1975). The Suppression Court specifically found that Ms. Oquendo never manually possessed the photos during the pictorial array, but that Detective Chidester displayed all twelve photos on the kitchen table without engaging in suggestive conduct that tainted the array. Findings of Fact and Conclusions of Law at 32–33. Since this conclusion is adequately supported in the record, Appellant's argument must fail.[7]

## ADMISSIBILITY OF CONFESSIONS

Appellant argues that his confession to the murder of Rochelle Graham was involuntary and should have been suppressed. Appellant contends that conduct of his uncles and the police vitiated his free will. Specifically, during the questioning, both uncles told Appellant, "if you did it Kevin, tell them." N.T. Suppression Hearing at 445. Detective O'Brien asked Appellant, "How many more little kids are you going to hurt?" *Id.* Officer Ligato told Appellant, "I know you did it, Kevin, and tell the truth." *Id.* at 2.284. Most importantly, Appellant notes that despite the fact that the results of the polygraph examination were inconclusive, Detective O'Brien testified that Appellant and both uncles were told that Appellant had failed the test. Combined with the fact that he had had only a few hours of sleep, and nothing to eat during the hours of interrogation, Appellant argues that his confession was involuntary.

7. Having concluded that the police conduct did not taint Ms. Oquendo's pre-trial identification of Appellant, we need not address Appellant's argument that she lacked an independent basis for her in-court identification.

This Court, in *Commonwealth v. Kichline,* 468 Pa. 265, 361 A.2d 282 (1976), articulated the standard for determining the voluntariness of custodial statements:

> Although there is no single litmus-paper test for determining the voluntariness of a confession, it must be established that the decision to speak was a product of a free and unconstrained choice of its maker.... All attending circumstances surrounding the confession must be considered in this determination. These include: the duration and methods of the interrogation; the length of delay between arrest and arraignment; the conditions of detainment; the attitudes of police toward defendant; the defendant's physical and psychological state; and all other conditions present which may serve to drain one's power of resistence to suggestion or to undermine one's self-determination.

*Id.,* 468 Pa. at 279, 361 A.2d at 289–90 (citations omitted).

■ The record reveals, and the Suppression Court specifically found, that the polygraphist told Detective O'Brien that Appellant had failed the test, without specifically stating to him that the results had been inconclusive. Therefore, the police did not engage in subterfuge by informing Appellant that he had failed the test.[8] N.T. Suppression

---

**8.** Even if the detective had known in advance that the results of the test were inconclusive when he informed Appellant that he had failed the test, we do not believe that Appellant's confession would thus be involuntary. Several cases in this Commonwealth have discussed the issue of police subterfuge in general, and more specifically as it relates to the admissibility of statements after a lie detector test. In *Commonwealth v. Jones,* 457 Pa. 423, 322 A.2d 119 (1974), we stated the general rule that an appellate court must determine whether the police subterfuge precluded the accused from making a knowing and intelligent waiver. Moreover, an alleged fabrication renders a confession inadmissible if it is likely to cause an untrustworthy confession. *Id.,* 457 Pa. at 434–35, 322 A.2d at 126. There, we held that intentional misrepresentations as to statements made by a codefendant were insufficient to make a confession involuntary. *See also Frazier v. Cupp,* 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969) (same).

In *Commonwealth v. Starr,* 486 Pa. 530, 406 A.2d 1017 (1979), *cert. denied sub nom., Pennsylvania v. Starr,* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 782 (1980), this Court found that an accused's waiver of his *Miranda* rights and subsequent confession were involuntary, where the police told the accused that the fact that he had failed a lie

Hearing at 2.200; Findings of Fact and Conclusions of Law at 51. Similarly, the record does not reveal that Appellant requested food or drink during the questioning. Moreover, the Suppression Court specifically found that Appellant was awake and responsive. Findings of Fact and Conclusions of Law at 22–23. Hunger and fatigue must be so acute as to render one's confession involuntary and one's waiver unknowing and unintelligent. *See Commonwealth v. Kichline, supra.* Such was not the case here. Accordingly, we believe that Appellant's confession was voluntary.

In addition to challenging the voluntariness of his confessions, Appellant argues that he could not and did not effectively waive his *Miranda* rights, and that therefore the Court should have suppressed his confession. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The Commonwealth has the burden to establish a knowing and voluntary waiver of *Miranda* rights. *Commonwealth v. Barry,* 500 Pa. 109, 454 A.2d 985 (1982); *Commonwealth v. Fogan,* 449 Pa. 552, 296 A.2d 755 (1972). To do so, it must establish that the warnings were given, and that the accused manifested an understanding of the warnings. *Commonwealth v. Smith,* 472 Pa. 492, 372 A.2d 797 (1977); *Commonwealth v. Bullard,* 465 Pa. 341, 350 A.2d 797 (1976).

detector test would be shown to the district attorney and the judge, who would know that he was lying. Similarly, in *Commonwealth v. Watts,* 319 Pa.Super. 179, 465 A.2d 1288 (1983), *aff'd,* 507 Pa. 193, 489 A.2d 747 (1985), the Superior Court held that it was impermissible for the police to stipulate with the accused that any negative test results would be introduced at trial.

*Starr* and *Watts* are distinguishible from the instant case, where the record reveals that the police at no time misled Appellant as to the admissibility of his polygraph examination. Rather, Appellant alleges that the police informed him that he had "failed" the test, when in fact they knew that the results were "inconclusive." Although "we emphasize that we do not condone deliberate misrepresentation of facts supplied to an accused at a time when he must elect to waive a Constitutional right," *Commonwealth v. Jones,* 457 Pa. at 435, 322 A.2d at 126–27, even if the facts were as Appellant claims, this type of information "would [not] so distort the factual situation confronting him as to render his waiver unknowing and unintelligent." *Id.*

Appellant initially argues that he lacked the mental capacity to make a knowing, intelligent, and voluntary waiver of his constitutional rights. He argues that he was seventeen years old, with an I.Q. of approximately eighty-one, and that he had a reading and writing ability equivalent to a second grader. Moreover, asserts Appellant, there was abundant testimony in the record that he was mentally ill, and that he lacked almost any ability to comprehend.

■ The record, however, reveals that the Appellant had waived his *Miranda* rights some years earlier in admitting the rape of another girl. Prior experience with *Miranda* warnings suggests that the current waiver was knowing and voluntary. *Commonwealth v. Hernandez*, 498 Pa. 405, 446 A.2d 1268 (1982); *Commonwealth v. Granger, supra.* Moreover, he admitted that he could read and write, and had advanced to the eleventh grade. In any event, at no time did Appellant himself read the warnings and statements. Each time, the police or his uncles read them to him. If the police give *Miranda* warnings orally, as here, an illiterate accused can still validly waive his rights. *Commonwealth v. Stafford*, 451 Pa. 95, 301 A.2d 600 (1973).

■ Similarly, Appellant's low I.Q. does not establish his inability to comprehend his rights. *Commonwealth v. Whitney*, 511 Pa. 232, 512 A.2d 1152 (1986) (plurality opinion) (low I.Q. does not invalidate confession); *Commonwealth v. Hernandez, supra* (sixteen-year-old Hispanic defendant with I.Q. of fifty-seven capable of understanding constitutional rights). Moreover, we have consistently refused to adhere to a *per se* rule of incapacity to waive constitutional rights based on mental disease or deficiency. *See Commonwealth v. Bracey*, 501 Pa. 356, 461 A.2d 775 (1983). Accordingly, we believe that there is ample support in the record for the conclusion that Appellant possessed the requisite mental capacity to waive his *Miranda* rights.

Appellant next contends that the police failed to follow the juvenile consultation rule enunciated in *Commonwealth v. McCutchen* 463 Pa. 90, 343 A.2d 669 (1975), *cert. denied sub nom., Pennsylvania v. McCutchen*, 424 U.S. 934, 96

S.Ct. 1147, 47 L.Ed.2d 341 (1976), and that therefore the Court should have suppressed his confession. *McCutchen* held that the police must give a juvenile defendant the opportunity to consult with an interested adult before the defendant could be deemed to have effectively waived his rights.[9] In *Commonwealth v. Barnes*, 482 Pa. 555, 394 A.2d 461 (1978), we articulated three requirements for a juvenile to waive his fifth and sixth amendment rights:

> (1) the juvenile must be given the opportunity to consult with an adult; (2) the adult must be one who is genuinely interested in the welfare of the accused juvenile; (3) the interested adult must be informed and aware of those Fifth and Sixth Amendment rights guaranteed to the juvenile.

*Id.*, 482 Pa. at 560, 394 A.2d at 464.

Appellant makes three arguments. First, he argues that he gave an inculpatory statement to Officer Ligato on January 11, 1980, before his uncles arrived at the police station. Second, he argues that neither uncle genuinely was interested in his welfare. Finally, he argues that neither uncle was informed of his rights, nor understood the effect of waiver.

[11] Appellant's contentions are unsupported by the record. Officer Ligato testified that from 7:30 a.m. to 8:00 a.m. on January 11, 1980, he took background information from Appellant, such as his name, age, address, religion, father, mother, school, etc. N.T. Suppression Hearing at 307. Although both uncles testified that the police had obtained a confession as to the Oquendo incident before they arrived, *Id.* at 670, 696, the Suppression Court had the prerogative to disregard that testimony. *Commonwealth v. Tucker, supra.* The Suppression Court specifically found that Officer Ligato did not question Appellant about the Oquendo incident during this period. Findings of Fact and

---

**9.** For cases occurring after April 17, 1984, juvenile confessions are governed by a totality of the circumstances test. *Commonwealth v. Williams,* 504 Pa. 511, 475 A.2d 1283 (1984). A review of this record reveals that even under this test, Appellant knowingly and intelligently waived his *Miranda* rights.

Conclusions of Law at 7, 39. This conclusion is supported in the record. In addition, although the detective did not precede this preliminary questioning with *Miranda* warnings, he did not conduct the questioning with the intent to extract incriminating statements, and therefore was not required to give the warnings. *See Commonwealth v. Davis,* 460 Pa. 37, 331 A.2d 406 (1975); *Commonwealth v. Yount,* 455 Pa. 303, 314 A.2d 242 (1974). Therefore, the fact that Appellant's uncles had not yet arrived and were not present for this questioning does not violate the rule in *McCutchen.*

■ Similarly, Appellant's contentions that his uncles were not interested in his welfare or aware of his rights also must fail. Appellant points only to the fact that, after he took the polygraph examination, his uncles prodded him to tell the truth. This fact, alone, is insufficient to show disinterest under *McCutchen. Cf. Commonwealth v. Thomas,* 486 Pa. 568, 571, 406 A.2d 1037, 1038 (1979) ("rule intends that overbearance may be avoided by consultation with individuals such as a lawyer, *adult relative,* or friend, who can provide a juvenile with the protection which his own maturity could not" (emphasis added)); *Commonwealth v. Smith, supra* (disinterested and uninformed father insufficient); *Commonwealth v. Starkes,* 461 Pa. 178, 335 A.2d 698 (1975) (mother who was *uninformed* of child's *Miranda* rights and prodded child to tell the truth insufficient). At the time of Appellant's arrest at his home on January 11, 1980, his grandmother, who was his legal guardian, requested that her sons accompany him. Both uncles stayed with Appellant during questioning, except that only one uncle was present during the polygraph test. In addition, the Suppression Court specifically found that at all times the police warned Appellant and his uncles of his fifth and sixth amendment rights, and that the three were awake, alert, responsive, and not under the effect of alcohol or drugs. Findings of Fact and Conclusions of Law at

22–23, 40–41. These facts support a finding of the uncles' genuine interest in Appellant's welfare.[10]

■ Appellant further argues that his confession on January 11, 1980, should have been suppressed due to the delay between it and the last reading of his *Miranda* rights. In *Commonwealth v. Upchurch*, 355 Pa.Super. 425, 513 A.2d 995 (1986), the Superior Court reiterated the relevant factors, which are:

(1) the time lapse between the last *Miranda* warnings and the appellant's statement; (2) interruptions in the continuity of the interrogation; (3) whether there was a change of location between the place where the last *Miranda* warnings were given and the place where the appellant's statement was made; (4) whether the same officer who gave the warnings also conducted the interrogation resulting in the appellant's statement; and (5) whether the statement elicited during the complained-of interrogation differed significantly from other statements which had been preceded by *Miranda* warnings.

*Id.*, 355 Pa.Superior Ct. at 432, 513 A.2d at 998. *See also Commonwealth v. Ferguson*, 444 Pa. 478, 282 A.2d 378 (1971). The record reveals that Appellant's admissions, made between 12:35 and 12:45 p.m. on January 11, 1980, were not immediately preceded by *Miranda* warnings. Detective O'Brien warned Appellant twice, first in the interview room at 10:00 a.m. and then again in the polygraph room at 11:18 a.m. N.T. Suppression Hearing at 422, 447. Thus, Appellant confessed within two and one-half hours of the initial warnings and within one and one-half hours of the subsequent warnings. In addition, the confession and

---

10. Appellant argues that, at age twenty, Morris Hawthorne *per se* lacked the maturity to provide meaningful adult consultation as required by *McCutchen*. We disagree. The *McCutchen* rule allowed anyone over eighteen to make a valid waiver of *Miranda* rights on his own and without adult assistance. Accordingly, if a person is sufficiently competent to waive his own *Miranda* rights, he must be competent enough to accord a juvenile that assistance required to waive the juvenile's rights. Therefore, we must reject Appellant's argument that only Edward Hawthorne, and not Morris Hawthorne, had the ability to assist him in waiving his *Miranda* rights.

the initial *Miranda* warnings were made and given in the same interview room, while the second *Miranda* warnings occurred in another room in the same building. Changing to rooms in the same building is a minimal disruption. *Commonwealth v. Upchurch, supra.* Moreover, Detective O'Brien gave the initial warnings, and he conducted the questioning at the time of the statement. N.T. Suppression Hearing at 447. Although when first warned Appellant made an exculpatory statement, his subsequent inculpatory statement was made in the context of a number of the above factors that establish that no re-warnings were needed. *See Commonwealth v. Benjamin,* 346 Pa.Super. 116, 499 A.2d 337 (1985); *Commonwealth v. Brown,* 341 Pa.Super. 138, 491 A.2d 189 (1985). Accordingly, we reject Appellant's argument that his confession should be suppressed for this reason.

In further challenging the admissibility of his statements, Appellant argues that the delay in taking him to the Youth Study Center on January 11, 1980, following his arrest for the rape of Ms. Oquendo, and the delay in arraignment on January 12, 1980, following his arrest for killing Rochelle Graham, require suppression of his statements. Rule 122 of the Pennsylvania Rules of Criminal Procedure states:

> When a defendant has been arrested in a court case, with a warrant, within the judicial district where the warrant of arrest was issued, the defendant shall be afforded a preliminary arraignment by the proper issuing authority *without unnecessary delay.*

Pa.R.Crim.P. 122 (emphasis added). Similarly, the "without unnecessary delay" language is found in Rule 130, which applies when the police have made an arrest without a warrant. Rule 1(a) of the Pennsylvania Rules of Criminal Procedure defines the scope of these rules. The rule states: "These rules shall govern criminal proceedings in all courts including courts not of record. Unless otherwise specifically provided, these rules shall not apply to *juvenile* or domestic relations proceedings." Pa.R.Crim.P. 1(a) (emphasis added). In *In re Geiger,* 454 Pa. 51, 309 A.2d 559 (1973),

and *Commonwealth v. Bey,* 249 Pa.Super. 185, 375 A.2d 1304 (1977), in interpreting the Juvenile Court Law, 11 Pa.Stat.Ann. §§ 243 to 270–5 (Purdon 1965) (repealed), and the Juvenile Act of 1972, 1972 Pa.Laws 333, 11 Pa.Stat.Ann. §§ 50–101 to 50–332 (Purdon Supp.1976) (repealed), it was held that the act of the police in arresting a juvenile is not by itself the initiation of a "juvenile proceeding," and that therefore the provisions of the Rules of Criminal Procedure would apply, specifically, the predecessor to Rule 130. In 1976, the legislature passed the Juvenile Act, 42 Pa.Cons. Stat.Ann. §§ 6301–6365 (Purdon 1982). At that time, the Act made no provision as to whether the arrest of a juvenile would initiate its protections.[11]

Accordingly, we must analyze Appellant's claim of delay under *Commonwealth v. Futch,* 447 Pa. 389, 290 A.2d 417 (1972) and its progeny, which define the "without unnecessary delay" language of Rules 122 and 130. In *Futch,* we

**11.** In February of 1980, after the arrest of Appellant, the legislature amended section 6321 by inserting section (a)(2.1), which states that taking a child into custody activates the provisions of the Juvenile Act. *See* 1980 Pa.Laws 12, 42 Pa.Cons.Stat.Ann. § 6321(a)(2.1) (Purdon 1982). Moreover, section 6324(2) states that a juvenile is taken into custody pursuant to the laws of arrest. Accordingly, subsequent cases are governed by the provisions of the Juvenile Act that relate to delay. Section 6326 states:

> A person taking a child into custody, *with all reasonable speed* and without first taking the child elsewhere, shall: ... (3) bring the child before the court or deliver him to a detention or shelter care facility....

*Id.* § 6326 (emphasis added). Moreover, section 6338 of the Act states that "[a]n extrajudicial statement, if obtained in the course of a violation of this chapter ... shall not be used against him." *Id.* § 6338. This Court has never defined the words "with all reasonable speed." We are not, however, without guidance. Every case that has addressed the issue has either directly or by analogy applied the "without unnecessary delay" language of Criminal Rules 122, 130, and *Commonwealth v. Futch,* 447 Pa. 389, 290 A.2d 417 (1972) and its progeny. *See, e.g., In re Parks,* 370 Pa.Super. 350, 355, 536 A.2d 440, 442 (1988); *In re Schirner,* 264 Pa.Super. 185, 188 n. 2, 190 n. 4, 399 A.2d 728, 730 n. 2, 730 n. 4 (1979); *In re White,* 264 Pa.Super. 190, 191–92, 399 A.2d 731, 731 (1979); *In re Anderson,* 227 Pa.Super. 439, 443, 313 A.2d 260, 261 (1973). Moreover, we see no reason to apply a different rule to juveniles. Therefore, we construe "with all reasonable speed" in the Juvenile Act to directly comport with Criminal Rules 122, 130, and *Futch* and its progeny.

stated the general rule that evidence obtained during unnecessary delay between arrest and arraignment would be inadmissible at trial, except for evidence that has no relationship to the delay. In *Commonwealth v. Williams*, 455 Pa. 569, 319 A.2d 419 (1976), we articulated a three-part test to determine if evidence obtained during a prearraignment delay would be suppressed. "The delay must be unnecessary; evidence that is prejudicial must be obtained; and the incriminating evidence must reasonably be related to the delay." *Id.*, 455 Pa. at 572, 319 A.2d at 420.

Subsequently, in *Commonwealth v. Davenport*, 471 Pa. 278, 370 A.2d 301 (1977), we held that if the police do not arraign the accused within six hours of arrest, any statement obtained after arrest but before arraignment would not be admissible at trial. The *Davenport* rule has been refined in *Commonwealth v. Duncan*, 514 Pa. 395, 525 A.2d 1177 (1987) (plurality opinion). In concluding that the *Davenport* rule was unworkable, we stated:

> Our experience with the per se application of the [*Davenport*] rule has proven to the contrary. The rule has been applied on a mechanical basis to violations which bear no relationship to the statement obtained and has shielded the guilty for no reason relevant to the individual circumstances of their case.

*Id.*, 514 Pa. at 405–06, 525 A.2d at 1182 (citations omitted). This Court further stated:

> the focus should be upon *when* the statement was obtained, i.e., within or beyond the six hour period. If the statement is obtained within the six hour period, absent coercion or other illegality, it is not obtained in violation of the rights of an accused and should be admissible. In keeping with the underlying objectives of the rule, only statements obtained after the six hour period has run should be suppressed on the basis of *Davenport*.

*Id.*, 514 Pa. at 406, 525 A.2d at 1182–83. We held that this new rule should be applied retroactively to all cases pending on direct review. *Id.*, 514 Pa. at 408, 525 A.2d at 1183.

Briefly reiterated, the events surrounding Appellant's confession on January 11, 1980, are as follows. After arresting him at his home at 6:53 a.m., the police took Appellant to the Police Administration Building, where he confessed to the Oquendo rape between 9:10 and 9:55 a.m., denied his participation in the Graham homicide between 10:15 and 11:10 a.m., and then confessed to the Graham homicide between 12:35 and 12:45 p.m. Detective O'Brien committed these oral admissions to writing between 12:45 and 12:58 p.m. A tape recording was further made of the contents of this written memorandum between 12:58 and 1:00 p.m.

■ Since Appellant gave his initial oral admissions to the police between 12:35 and 12:45 p.m., within six hours of the time of his arrest at 6:53 a.m., they properly were admitted under the *Davenport–Duncan* rule. Moreover, since the subsequent written memorandum was merely a recital of Appellant's confession, not obtained in violation of *Davenport–Duncan,* it was not error to admit this statement at trial. *See Commonwealth v. Rowe,* 459 Pa. 163, 327 A.2d 358 (1974). *See also Commonwealth v. Pritchett,* 320 Pa.Super. 359, 365–66, 467 A.2d 364, 367–68 (1983) (citing pre-*Davenport* cases).

■ With respect to the second confession, at 2:15 p.m. on January 12, 1980, the police arrested Appellant at the Youth Study Center for the homicide of Rochelle Graham, and transported him to police headquarters, where they arrived at 2:25 p.m. From 2:45 to 5:05 p.m., Appellant confessed to the killing of Rochelle Graham. At 6:35 p.m., the police taped his inculpatory statement. Since both the statement and the taping occurred within six hours of arrest, this statement properly was admitted at trial. *Commonwealth v. Duncan, supra.*

## PRE–TRIAL PUBLICITY

Appellant argues that extensive pre-trial publicity violated his right to a fair trial, and that the Trial Court erred in denying his motion for a change in venue. *See* Pa.R.

Crim.P. 312. Appellant contends that the publicity was so pervasive and inflammatory, both at the time of the incident and at the time of the trial, that "inherently prejudicial" pre-trial publicity occurred, and that therefore he did not receive a fair trial.

The test for a change in venue due to pre-trial publicity was articulated in *Commonwealth v. Pursell*, 508 Pa. 212, 495 A.2d 183 (1985):

> The grant or denial of a change of venue is a matter within the sound discretion of the trial judge, who is in the best position to assess the community atmosphere and judge the necessity for a venue change. *Commonwealth v. Daugherty*, 493 Pa. 273, 426 A.2d 104 (1981); *Commonwealth v. Rigler*, 488 Pa. 441, 412 A.2d 846 (1980); *Commonwealth v. Richardson*, 476 Pa. 571, 383 A.2d 510 (1978). The trial court's denial of the motion will be reversed only where there is an abuse of discretion.

In *Commonwealth v. Romeri*, 504 Pa. 124, 470 A.2d 498, 501–03 (1983), *cert. denied*, 466 U.S. 942, 104 S.Ct. 1922, 80 L.Ed.2d 469 (1984) (quoting *Commonwealth v. Casper*, 481 Pa. 143, 150–151, 392 A.2d 287, 291 (1978), we summarized the law in this area by reference to *Commonwealth v. Casper* as follows:

> [A]n application for a change of venue is addressed to the sound discretion of the trial court, and its exercise of discretion will not be disturbed by an appellate court in the absence of an abuse of discretion. (citations omitted) In reviewing the trial court's decision, the only legitimate inquiry is whether any juror formed a fixed opinion of [the defendant's] guilt or innocence as a result of the pre-trial publicity.

We have, however, recognized that occasions may arise where the pre-trial publicity is so pervasive and inflammatory that a defendant's normal burden of demonstrating actual juror prejudice is obviated. Pre-trial prejudice is presumed if: (1) the publicity is sensational, inflammatory, and slanted towards conviction rather than factual and objective; (2) the publicity reveals the accused's prior

criminal record, if any, or if it refers to confessions, admissions, or reenactments of the crime by the accused; and (3) the publicity is derived from police and prosecuting officer reports.

The publicity must be so extensive, sustained and pervasive without sufficient time between publication and trial for the prejudice to dissipate, that the community must be deemed to have been saturated with it.

*Id.*, 508 Pa. at 220–21, 495 A.2d at 187–88.

On January 28, 1981, the Trial Court conducted a hearing on the motion for a change of venue. Appellant introduced three different news articles appearing on the same date in three different newspapers. On January 19, 1980, the Philadelphia Daily News printed on the fourth page an article entitled "RAPE SLAY SUSPECT FINGERED IN 3RD ATTACK." The Philadelphia Inquirer ran a similar story. In addition, The Philadelphia Tribune published a story with a headline that read, "SIX YEAR OLD GIRL ACCUSER: GRAHAM'S ALLEGED KILLER IS SUSPECT IN ANOTHER RAPE." Each article referred to "Peanut" Hughes as the defendant who allegedly murdered and raped Rochelle Graham. These articles made reference to Appellant's confessions, police reports, and an unrelated rape.

Nevertheless, a trial court does not abuse its discretion by denying a motion to change venue where a sufficient amount of time has elapsed between the presumptively prejudicial pre-trial publicity and the time of trial so that the prejudice has dissipated and the community is no longer saturated with the publicity. *Commonwealth v. Pursell, supra* (three day period of saturation followed by six month period with no publicity sufficient to dispel saturation); *Commonwealth v. Galloway,* 495 Pa. 535, 434 A.2d 1220 (1981) (five and one-half months sufficient); *Commonwealth v. Atkinson,* 364 Pa.Super. 384, 528 A.2d 210 (1987) (five month period sufficient). Instantly, the articles were published on one day, January 19, 1980, and the hearing was conducted on January 28, 1981, more than one year

later. No other articles were published in the interim. This one year period was sufficient to dissipate any possible prejudice and to lessen any saturation of the community with the Graham incident.

Appellant further argues that publicity that occurred around the first day of trial likely prejudiced the non-sequestered jury. Specifically, he notes that the Philadelphia Journal published, on February 27, 1981, an article with a headline that read, "D.A., 'PEA TO FRY FOR KILLING TOT.'" The Philadelphia Bulletin also published an article concerning the trial. Moreover, a local television station ran a news story that reported Appellant's involvement in prior and subsequent rapes. The same station also called this case "the most brutal rape case ever in the history of Philadelphia." Lastly, Appellant notes that three of the jurors and several spectators wore green ribbons on their coats before the trial began to symbolize the sexual assault and disappearance of young black children in Atlanta. Appellant argues that the jurors' use of these ribbons indicates that they had a deep-seated sympathy for the children, and that the ribbons, combined with the publicity, created an air of sensationalism that denied him a fair trial.

■ Anticipating a rash of news coverage at the start of the trial, Judge Latrone specifically instructed the jury not to listen to radio newscasts, not to watch TV, and not to read the newspapers. Moreover, on the second day of trial, the Court and counsel questioned all fourteen members of the jury about whether they had read or heard anything in the news media, or from third persons, that would affect their ability to render an impartial verdict. N.T. at 148–75. Most jurors stated that they had heard nothing. Juror number four stated that juror number twelve told her that she had heard about the case on the news. The Trial Court stated, "[u]pon examining the demeanor of juror 12 in the witness box and analyzing the testimony of both juror 4 and juror 12, this Court determined that juror 12 had not heard

anything on television which would prevent her from being a fair and impartial juror." [12]   Trial Ct. slip. op. at 29. Moreover, defense counsel conceded that a mistrial was not necessary.   N.T. at 175–76.   The Trial Court then immediately sequestered the jury for the remainder of the trial. We believe that the Trial Court's instructions to avoid media contact, the results of the voir dire, and the subsequent sequestration of the jury afforded Appellant sufficient protection to guarantee him a fair trial.

■■■   Concerning the green ribbons, on the first day of trial, after seven days of empanelling the jury, and before it was sworn, defense counsel informed the judge that several spectators and three members of the jury were wearing green ribbons to symbolize the plight of black children in Atlanta.   At the request of counsel, the Trial Court ordered all spectators to remove the ribbons, and questioned the jurors about whether their wearing the ribbons evidenced a

**12.** The following exchange took place between the Court and juror twelve:

> Q.  From the time you left here yesterday at that designated time until the time you reported in this morning, did you personally listen to, watch, read, or see anything concerning this case in the news media—radio, television, or the newspapers?
> A.  Yes.
> Q.  What was the circumstance?
> A.  I had turned my TV off as soon as I heard it.  I didn't listen to none of it.  My husband had it on too loud.  I could hear it upstairs in my bedroom.
> Q.  Did you hear any of it?
> A.  No, I didn't.
> Q.  Did you discuss that with any of the other jurors in the jurors' room, that you heard something about it?
> A.  No.
> Q.  Better yet, did any third person—family, friend, stranger, relative, or fellow juror—make reference to you that they had heard anything about the case, whether it was from the time you left until the time you came in this morning?
> A.  No.
> Q.  You are absolutely sure—how did you get it cut off so quickly?
> A.  I just hollered down to my husband to turn the TV off, that's all. I just didn't want to hear it.
> Q.  And in all truth, you did not hear anything?
> A.  No, I didn't.

N.T. at 169–70.

bias against Appellant.[13] Each juror agreed to remove the

**13.** The following individual exchanges occurred between the Court and the respective jurors outside the hearing of any other jury member:

Q. [Y]ou are so emotionally affected by the inhumane treatment of Black youths in Atlanta that you want to explicitly exhibit your feelings for them and your protest against the impropriety of that which is taking place; is that right?

JUROR NO. 2: Well, Your Honor, it's not Black children or white children.

Q. All right. Children.

JUROR NO. 2: Yes. Well, I think it's something that needs to be remembered. Let's put it that way.

Q. All right. Having expressed that sentiment, do you feel that your intensity of feeling, that you would outwardly exhibit what your emotions are by wearing the ribbon, would prevent you from being a fair and impartial juror in this case because, as we all well know, this case involves a fatal infliction of harm on a female child, whatever the race might be?

JUROR NO. 2: No. sir, it wouldn't have any effect on my judgment. Let's put it that way.

Q. You are not that stirred up about the principle, which all of us will accept as a correct principle—I'm not arguing with the principle—

JUROR NO. 2: I know.

Q. —that any one who has inflicted acts of violence or acts of fatal violence upon the youths of America has done something wrong, should be punished, and we should sympathize with the families of the victims; is that correct?

JUROR NO. 2: Well, as I said, for the family members and for those children to be remembered.

Q. Do you think that, having exhibited a ribbon to show that you are involved in that, in effect, protest against the violence on a matter of national level would prevent you from being a fair and impartial juror in this case?

JUROR NO. 2: No, sir.

Q. Notwithstanding the exhibition of the ribbon, you could follow my instructions that you well and truly try the issues joined in this case and determine guilt or innocence only on the basis of the evidence and in an unemotional fashion, unconcerned with, let's call it, national philosophic trends or the emotional impact of the publicity that is currently pervading the American society on the question of violence and fatal infliction of violence to children?

JUROR NO. 2: Yes, sir.

. . . .

Q. The fact that you were wearing the ribbon and that you are emotionally, through outward exhibition of the ribbon, showing how you feel about violence to youths, does that indicate how you feel about the facts of this case? Because, this case involves a little child.

JUROR NO. 4: No. I wore it as a symbol—just like for the hostages. I just put it on, you know.

ribbon, and the Court determined that none of the three had formulated an opinion that prevented him or her from giving the Appellant a fair trial. Moreover, the record revealed that defense counsel briefly questioned one of the three jurors, and did not question the other two. In addition, counsel did not make a motion for a mistrial, thereby evincing his satisfaction with the jury's impartiality. In light of the voir dire of the jurors, the fact that defense counsel was satisfied, and the fact that the wearing of the ribbons occurred only briefly before the jury was sworn and discontinued immediately, we believe that Appellant was not denied a fair trial. *Commonwealth v. Martinolich*, 456 Pa. 136, 318 A.2d 680, *cert. denied sub nom., Martinolich*

Q. So, if I were to instruct you that you were to decide the case on the facts as determined from the evidence produced in this courtroom, would you be able to do that?
JUROR NO. 4: I will.
. . . .
Q. Now, would you be able to decide the case on the basis of the evidence, in a fair and impartial fashion, without worrying about or being concerned about Atlanta, national TV, or vindicating any philosophic principles of fatal violence to youths is inhumane?
JUROR NO. 4: I will.
. . . .
Q. Do you think it is proper to wear a button that shows that you are sympathizing with the concept of—that it is wrong to injure and abuse children in the United States, where the victim in this case is a youth, also? Doesn't it show that you may be so emotionally involved in that principle that you perhaps won't be able to think fairly in the case?
JUROR NO. 13: No.
Q. Are you sure?
JUROR NO. 13: I'm positive about that.
. . . .
Q. But this case must not be decided on what is happening in Atlanta, it must not be decided on the press promotion of public opinion and protest against violence to youths. It has to be decided on what evidence is presented in this courtroom.
JUROR NO. 13: Right.
Q. If I instruct you that you are to decide this case, Kevin Hughes' case, on the evidence presented here, unemotionally, without any reference to what is going on in Atlanta, what you are hearing on the radio, television, and no matter what the overall ocean of publicity and public opinion is respecting the wrongness of violence to youths, would you be able to do it?
JUROR NO. 13: Yes.
N.T. at 14–25.

*v. Pennsylvania,* 419 U.S. 1065, 95 S.Ct. 651, 42 L.Ed.2d 661 (1974). *Cf. Commonwealth v. Richardson,* 476 Pa. 571, 383 A.2d 510 (no error where innocuous contact between judge and jury before jury was sworn), *cert. denied sub nom., Richardson v. Pennsylvania,* 436 U.S. 910, 98 S.Ct. 2248, 56 L.Ed.2d 410 (1978).

## EVIDENCE OF OTHER CRIMES

██ Appellant argues that the Trial Court committed reversible error by permitting Marie Oquendo to testify that Appellant raped her on January 5, 1980, for the purpose of establishing his identity as well as establishing a common scheme, plan, or design for the rape and murder of Rochelle Graham.

This Court, in *Commonwealth v. Morris,* 493 Pa. 164, 425 A.2d 715 (1981), stated the law as follows:

> It is a principle of long standing in this Commonwealth that evidence of a distinct crime, except under special circumstances, is inadmissible against a defendant who is being tried for another crime because the commission of one crime is not proof of the commission of another, and the effect of such evidence is to create prejudice against the defendant in the jury's mind.... The general rule, however, allows evidence of other crimes to be introduced to prove ... (4) a common scheme, plan or design embracing commission of two or more crimes so related to each other that proof of one tends to prove the others; or (5) to establish the identity of the person charged with the commission of the crime on trial, in other words, where there is such a logical connection between the crimes that proof of one will naturally tend to show that the accused is the person who committed the other.

*Id.,* 493 Pa. at 175, 425 A.2d at 720 (citations omitted). *See also Commonwealth v. Fortune,* 464 Pa. 367, 346 A.2d 783 (1975); C. McCormick, *Evidence* § 190, at 559–60 (3d ed. 1984) (discussion of admissibility of "signature" crimes).

A comparison of the two crimes, gleaned from Ms. Oquendo's testimony and Appellant's confessions, yields the

following similarities: (1) both crimes involved young females (Graham was nine; Oquendo was twelve); (2) both victims were non-Caucasian (Graham was Negro; Oquendo was Puerto Rican); (3) both crimes occurred during the daytime; (4) both crimes took place within a four-block radius; (5) both crimes took place within a five-minute walk from Appellant's home; (6) both crimes involved circumstances in which the victim was lured or strong-armed off the street; (7) both victims were taken to upstairs bedrooms of vacant buildings; (8) in both crimes the assailant ordered the victims to undress; (9) both crimes involved rape, other sex acts (Graham was anally; Oquendo was orally), and manual strangulation; and (10) both crimes involved circumstances in which the accused and the victims previously were acquainted.

In *Commonwealth v. Patterson*, 484 Pa. 374, 399 A.2d 123 (1979), we held inadmissible evidence of another rape, where the victims were of different ages and sexual attractiveness, the weapons used were not identical, one rape occurred in a garage while the other occurred in an apartment, and nothing distinctive separated the two crimes from other street crimes. *Id.*, 484 Pa. at 380, 399 A.2d at 127. Unlike in *Patterson*, an analysis of the aforementioned similarities leads us to conclude that there was a logical connection between the two crimes, and that therefore the Trial Court did not err in permitting evidence of the Oquendo rape. The similarities are not confined to insignificant details that would likely be common elements regardless of who had committed the crimes, *see Commonwealth v. Bryant*, 515 Pa. 473, 530 A.2d 83 (1987), but rather truly represent Appellant's signature. The time lapse of ten months between the sexual attacks does not render the second attack inadmissible. *Commonwealth v. Booth*, 291 Pa.Super. 278, 435 A.2d 1220 (1981); *Commonwealth v. Bradley*, 243 Pa.Super. 208, 364 A.2d 944 (1976). Both girls were young, hence sexually immature. *Commonwealth v. Patterson, supra.* Both rapes occurred within a tight geographic region, and during the daytime. *Commonwealth v. Morris, supra.* Both rapes were strikingly sim-

ilar in the implementation of the assault, namely, taking a young girl into an upstairs bedroom of a vacant building. *See Commonwealth v. Kjersgaard,* 276 Pa.Super. 368, 419 A.2d 502 (1980). In both cases, the victims were choked. *See also Commonwealth v. Clayton,* 506 Pa. 24, 483 A.2d 1345 (1984) (mere fact that one crime resulted in wounding rather than death would not vitiate admissibility under exception).

Moreover, there was further evidence that established a link between the perpetrators of the two crimes and Appellant. Specifically, the Graham crime scene had the letters "PEA" burned into the ceiling, and the police discovered the letters "PEANUT" burned into Appellant's bedroom ceiling when they arrested him on January 11, 1980. Moreover, Ms. Oquendo knew Appellant as "Peanut" in the community. The chance that two different people, both nicknamed Peanut, committed the crimes is small. Accordingly, we believe that the Trial Court did not abuse its discretion by allowing evidence of the Oquendo rape.

## DEATH–QUALIFIED JURY

Appellant lastly contends that his conviction must be overturned because he was tried before a death-qualified jury. He argues that a juror who is willing to impose the death penalty is more prosecution-oriented than one who is not so willing. Thus, according to Appellant, this selection of a predisposed jury denied him due process. Appellant further argues that, since those defendants that were tried before enactment of the death penalty statute in 1978 were tried before juries not death-qualified, he has been denied equal protection of the law.

The United States Supreme Court has held that it is permissible to disqualify one from the venire whose views on the death penalty would interfere with their ability to be fair and impartial. *Lockhart v. McCree,* 476 U.S. 162, 165, 106 S.Ct. 1758, 1760, 90 L.Ed.2d 137 (1986). In *Lockhart,* the Court rejected the claim that the death qualification procedure resulted in a conviction-prone jury. *Id.* at 165,

106 S.Ct. at 1760. *See Commonwealth v. Smith*, 511 Pa. 343, 513 A.2d 1371 (1986); *Commonwealth v. Colson*, 507 Pa. 440, 490 A.2d 811 (1985), *cert. denied sub nom., Colson v. Pennsylvania*, 476 U.S. 1140, 106 S.Ct. 2245, 90 L.Ed.2d 692 (1986). Thus, Appellant's contention that his jury was more prone to conviction than a jury deciding a case prior to 1978 is without merit.

The judgment of sentence is affirmed.[14]

Mr. Justice McDERMOTT, J., files a concurring opinion in which LARSEN and PAPADAKOS, JJ., join.

McDERMOTT, Justice, concurring.

I generally concur with the Majority Opinion because there was not in fact even a violation under the six-hour rule of *Commonwealth v. Davenport*, 471 Pa. 278, 370 A.2d 301 (1977). Therefore, there was no need to go further and any analysis of the *Davenport* decision was unnecessary in this case. Whether *Commonwealth v. Duncan*, 514 Pa. 395, 525 A.2d 1177 (1987), in modifying *Davenport*, reiterates or revivifies the mechanical and discredited six-hour rule is not a question that needs decision here. On that question I have vigorously dissented and I remain in dissent on any interpretation of *Davenport–Duncan* that gives any new vogue to mechanical, *per se* application of a six-hour time limit. An involuntary confession can be extorted in five minutes or six hours. Time is important but not of the essence. It must be considered with other factors, but is not by mere passage determinative. See my

**14.** As is the practice of this Court, we have examined the sentence of death in order to determine if it is disproportionate or excessive to the penalty imposed in similar cases. *See Commonwealth v. Blystone*, 519 Pa. 450, 549 A.2d 81 (1988). Having considered the circumstances of the crime and the character of the Appellant, we conclude the sentence is not excessive or disproportionate. The jury determined there were no mitigating circumstances but found one aggravating circumstance, namely, killing while in the perpetration of a felony. N.T. 3–23 and 3–24–81 at 2118. The statute requires a verdict of death in such circumstances. 42 Pa.Cons.Stat.Ann. § 9711(c)(1)(iv) (Purdon 1982). The study maintained by the Administrative Office of the Pennsylvania Courts indicates the sentence is neither disproportionate nor excessive in comparison with similar cases.

462

Concurring Opinions in *Commonwealth v. Duncan*, 514 Pa. 395, 525 A.2d 1177 (1987); *Commonwealth v. Keasley*, 501 Pa. 461, 462 A.2d 216 (1983); *Commonwealth v. Jenkins*, 500 Pa. 144, 454 A.2d 1004 (1982); *Commonwealth v. Bennett*, 498 Pa. 656, 450 A.2d 970 (1982).

LARSEN and PAPADAKOS, JJ., join in this concurring opinion.