J-A18040-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| VERNON LEE SINGER, | : | |
| | : | |
| Appellant | : | No. 1122 MDA 2014 |

Appeal from the Judgment of Sentence entered on July 1, 2014
in the Court of Common Pleas of Cumberland County,
Criminal Division, No. CP-21-CR-0003274-2013

BEFORE:  FORD ELLIOTT, P.J.E., STABILE and MUSMANNO, JJ.

MEMORANDUM BY MUSMANNO, J.:                 **FILED JULY 28, 2015**

Vernon Lee Singer ("Singer") appeals from the judgment of sentence

imposed following his conviction of resisting arrest, and the summary

offense of public drunkenness.[1]  We vacate Singer's judgment of sentence.

The trial court summarized the facts underlying the instant appeal as

follows:

> About 1:00 a.m.[,] on the morning of August 23, 2013[,]
> Pennsylvania State Troopers [Kory Wardrop ("Trooper Wardrop")
> and Keith Rudy ("Trooper Rudy")] were dispatched to a
> residence in South Hampton Township, Cumberland County,
> Pennsylvania[,] for a domestic disturbance.  They were advised
> that [Singer] was intoxicated and verbally abusive toward his
> family.
>
> When the troopers arrived[, Singer] was no longer at the
> residence.  His family was concerned that he might try to harm
> himself.  Consequently[,] the troopers and family members
> began to search the area.  While the area is wooded and rural,

_____

[1] 18 Pa.C.S.A. §§ 5104, 5505.

there are other residences scattered around. The nearest residence is within shouting distance.

After about an hour of searching the area without results, the troopers gave up and left. Shortly after leaving[,] they received another call from the family. This time[,] they were told that [Singer] was banging on the window, holding a hatchet/axe[,] and threatening to kill himself. Troopers Wardrop and Rudy returned to the scene along with their corporal, Chester Dabrowski ["Corporal Dabrowski"]. Shortly thereafter[,] two other troopers joined them.

Before the troopers arrived[, Singer] fled back into the woods. Trooper Wardrop called [Singer] on his cell phone as Corporal Dabrowski and Trooper Rudy canvassed the area. [Singer] told Trooper Wardrop that he intended to kill himself. The two other officers were able to locate [Singer] from the light on his cell phone. However, when they got close to [Singer,] he put the hatchet to his throat, telling the troopers not to come any closer. As they yelled at him to drop the axe, [Singer] took off through the woods and into a cornfield.

The troopers split up to search for [Singer]. Trooper Rudy entered the cornfield with one of [Singer's] nephews, hoping to find his trail by following corn that had been knocked down. Trooper Rudy noticed the odor of alcohol just as [Singer] jumped up[,] startling the trooper and his nephew. [Singer] again disappeared into the corn field with hatchet in hand.

After searching for an hour and twenty minutes[,] the Corporal decided to wait until daylight so that a helicopter could be used to assist them. The five troopers and various family members regrouped back at the residence. At that point[,] someone spotted [Singer] in the yard of a neighboring residence. As the troopers got near to [Singer], he lifted the hatchet to his neck yet again. Four of the five troopers were forced to tase [Singer], with no apparent effect. They then had to tackle him in order to get him into custody.

Once [Singer] was in custody[,] it was apparent that he was intoxicated. He reeked of alcohol and his eyes were bloodshot and glassy. Furthermore, [Singer] had a B.A.C. of 0.075% several hours after he had stopped drinking. He was taken to crisis intervention and eventually committed to a

psychiatric facility for treatment. The instant charges[, disorderly conduct,[2] public drunkenness and resisting arrest,] were filed several weeks later[,] on November 1, 2013.

Trial Court Opinion, 11/6/14, at 1-3 (footnote added).

A jury subsequently acquitted Singer of disorderly conduct, but convicted Singer of resisting arrest. Additionally, the trial court found Singer guilty of the summary offense of public drunkenness. The trial court subsequently sentenced Singer to probation for his conviction of resisting arrest, and to pay the costs of prosecution for his conviction of public drunkenness. Thereafter, Singer filed the instant timely appeal, and a court-ordered Pa.R.A.P. 1925(b) Concise Statement of Matters Complained of on Appeal.

On appeal, Singer presents the following claim for our review:

Was the evidence presented at trial sufficient to sustain a conviction on any of the charges[,] when the evidence showed that the Commonwealth failed to prove all [of] the elements for each offense beyond a reasonable doubt?

Brief for Appellant at 5.

Singer argues that the Commonwealth's evidence is insufficient to prove the crime of resisting arrest. *Id.* at 13. Specifically, Singer argues that his resisting arrest conviction cannot be sustained because his underlying arrest (for disorderly conduct and public drunkenness) was unlawful. *Id.* at 14. According to Singer, "police cannot lawfully arrest someone under 'some form of generalized probable cause' standard." *Id.* at

---

[2] 18 Pa.C.S.A. § 5503.

15 (quoting *Commonwealth v. Wertelet*, 696 A.2d 206, 209 n.5 (Pa. Super. 1997). In this regard, Singer asserts that the officers failed to prove that he appeared in any "public" area, manifestly under the influence of alcohol or a controlled substance, as required by statute. Brief for Appellant at 15. In particular, Singer argues, there is no evidence that the incident occurred in "public," such as in a street, park, or throughout a neighborhood. *Id.* at 16. Rather, the incidents took place at a residence and, therefore, the troopers' interaction with him could not have occurred in a "public place." *Id.*

We review a challenge to the sufficiency of the evidence under the following standard of review:

> A claim challenging the sufficiency of the evidence presents a question of law. *Commonwealth v. Widmer*, 560 Pa. 308, 744 A.2d 745, 751 (Pa. 2000). We must determine "whether the evidence is sufficient to prove every element of the crime beyond a reasonable doubt." *Commonwealth v. Hughes*, 521 Pa. 423, 555 A.2d 1264, 1267 (Pa. 1989). We "must view evidence in the light most favorable to the Commonwealth as the verdict winner, and accept as true all evidence and all reasonable inferences therefrom upon which, if believed, the fact finder properly could have based its verdict." *Id.*

*Commonwealth v. Thomas*, 65 A.3d 939, 943 (Pa. Super. 2013).

> [T]he facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact[,] while passing

upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Id.* (quoting *Commonwealth v. Ratsamy*, 594 Pa. 176, 934 A.2d 1233, 1236 n.2 (Pa. 2007)).

The Crimes Code defines the crime of resisting arrest as follows:

A person commits a misdemeanor of the second degree if, with the intent of preventing a public servant from effecting a lawful arrest or discharging any other duty, the person creates a substantial risk of bodily injury to the public servant or anyone else, or employs means justifying or requiring substantial force to overcome the resistance.

18 Pa.C.S.A. § 5104. A lawful arrest is an element of the crime of resisting arrest. *Commonwealth v. Jackson*, 924 A.2d 618, 620 (Pa. 2007). "[T]he lawfulness of an arrest depends on the existence of probable cause to arrest the defendant." *Id.*

Here, Singer was arrested for the crimes of disorderly conduct and public drunkenness.[3] The Crimes Code defines the crime of disorderly conduct, in relevant part, as follows:

(a) *Offense defined.* --A person is guilty of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he:

...

(4) creates a hazardous or physically offensive condition by any act which serves no legitimate purpose of the actor.

---

[3] *See* N.T., 5/12/14, at 38 (wherein Corporal Dabrowski testified that at first, they intended to arrest Singer for disorderly conduct, but added public drunkenness when they discovered Singer to be intoxicated).

18 Pa.C.S.A. § 5503(a)(4). The term "public" is specifically defined at section 5503(c):

> As used in this section the word "public" means affecting or likely to affect persons in a place to which the public or a substantial group has access; among the places included are highways, transport facilities, schools, prisons, apartment houses, places of business or amusement, any neighborhood, or any premises which are open to the public.

*Id.* § 5503(c).

For purposes of section 5503(c), a place may be "public," even if it is privately owned, so long as it is generally accessible to the public. ***Commonwealth v. Whritenour***, 751 A.2d 687, 688 (Pa. Super. 2000). In ***Whritenour***, the defendant appeared inebriated on a road in a private community. This Court held that the "public" element of disorderly conduct was met under the following circumstances:

> Here, the argument is that the road in question was located in a private community, which necessarily excludes the public, and is accessible only to residents or those present by permission of a resident. However, the road was located in a neighborhood, whatever its legal constitution, and was traversed by members of the community and their invitees or licensees. This "public," albeit a limited one, included residents of the homes in the community, their guests and employees, as well as visitors attending religious events, users of the public library located in the community, and delivery people of all kinds.
>
> …
>
> Although the record contains no information on the legal theory under which the community was constituted, there is also nothing to indicate that Appellant possessed exclusive control of the roadway. Indeed, the opposite is true, as some of the community's traffic regulations are included, and they provide that for violations other than those mentioned in the regulations,

"the Pennsylvania Vehicle Code shall apply." (Defendant's Exhibit 1). Thus the privacy which attaches to membership in Hemlock Farms is not absolute as it applies to the roadway.

*Id.* at 688. *See also Commonwealth v. Fedorek*, 946 A.2d 93, 100 (Pa. 2008) (recognizing that conduct directed at only one person may be sufficient to sustain a conviction of disorderly conduct as a third-degree misdemeanor, where the conduct takes place in the "public arena");[4] *cf. Commonwealth v. Lawsom*, 759 A.2d 1, 6 (Pa. Super. 2000) (concluding that the Commonwealth failed to establish the "public" element of disorderly conduct where the defendant's party was open only to renters of an apartment and invited guests).

The Crimes Code defines the summary offense of public drunkenness as follows:

> A person is guilty of a summary offense if he appears **in any public place** manifestly under the influence of alcohol … to the degree that he may endanger himself or other persons or property, or annoy persons in his vicinity….

18 Pa.C.S.A. § 5505 (emphasis added). Section 5505 does not define the term "public." However, in *Commonwealth v. Meyer*, 431 A.2d 287 (Pa. Super. 1981), this Court observed that

> [t]he term does appear, however, in two places in the Crimes Code: in the section dealing with prostitution, section 5902, and in the section dealing with disorderly conduct, section 5503. Section 5902(f) defines it as "any place to which the public or

---

[4] We note that in *Fedorek*, our Supreme Court abrogated this Court's decision in *Commonwealth v. Smith*, 811 A.2d 578 (Pa. Super. 2002), and *Commonwealth v. Coon*, 695 A.2d 794 (Pa. Super. 1997).

> any substantial group thereof has access." The ordinary meaning of "access" is: "the right to enter or make use of;" "the state or quality of being easy to enter."
>
> Section 5503(c) defines public places as, *inter alia*, "any premises which are open to the public."

*Meyer*, 431 A.2d at 289 (footnotes omitted). In *Meyer*, this Court deemed the evidence insufficient to establish the "public" element of public drunkenness, where the altercation took place at a V.F.W. Post, a private club to which the public did not have access. *Id.*

Our review of the record, in a light most favorable to the Commonwealth, discloses insufficient evidence to establish the "public" element required to arrest Singer for disorderly conduct and/or public drunkenness. At trial, Trooper Wardrop testified that just before 1:00 a.m. on August 23, 2013, while working the midnight shift with Trooper Rudy, he was dispatched to 25 Gutshall Road in Southampton Township, for a domestic dispute. N.T., 5/12/14, at 8-10. After speaking with Paula Black ("Black"), Singer's sister, Trooper Wardrop and Trooper Rudy canvassed the area, searching for Singer, who purportedly was intoxicated. *Id.* at 10. Regarding the area to be searched, Trooper Wardrop testified as follows:

> It's a remote area. There's a trailer that sits at the front of the trailer [*sic*]. The trailer door faces the road. Behind that is a very short backyard with, I believe, a tall fence.
>
> Behind the fence is a very open, grassy area. On the other side of the grass[y] area is a wooded area. To the … north side of the residence, there is a corn field and other wooded areas.

- 8 -

*Id.* at 10-11. According to Trooper Wardrop, the area was not developed. *Id.* at 11. After an unsuccessful search for Singer, the troopers left the scene, advising family members to contact them if Singer returned. *Id.* at 13.

At about 2:10 a.m., family members reported that Singer had returned to the residence and, with a hatchet in his hand, "was banging on the trailer windows from the outside." *Id.* Upon their arrival, the troopers were told that Singer fled when he saw the police vehicle. *Id.* at 14. Thereafter, another officer, Corporal Dabrowski, arrived at the scene and assisted in the search for Singer. *Id.*

Trooper Wardrop testified that he called Singer's cell phone. *Id.* Singer answered, and threatened to kill himself. *Id.* Trooper Wardrop acknowledged that he did not know of Singer's location at that time, and testified that Singer "was somewhere hiding around the residence." *Id.*

Trooper Wardrop stated that, while on the phone, he heard Singer yell, "Get away from me. Get away from me." *Id.* at 14-15. According to Trooper Wardrop, he then heard Singer "going through some type of brush or corn … at the time the phone got disconnected." *Id.* at 15. At about 3:30 a.m., while outside at the front of the residence, Trooper Wardrop saw Singer walking from the back of the residence to the front, carrying the hatchet. *Id.* at 16. Singer, upon seeing the troopers, "took off around the back of the residence, around the fence, into the big open grass area." *Id.*

Singer held the hatchet to his neck, refusing to drop it, even after being struck multiple times by tasers. *Id.* at 16-17. Singer ran toward the wooded area, but finally complied with commands upon being tased by Corporal Dabrowski. *Id.* at 17. At that point, the troopers forcibly took Singer into custody. *Id.* at 17-18. On cross-examination, Trooper Wardrop confirmed that Singer did not threaten anyone, other than himself, with the hatchet. *Id.* at 21.

Trooper Rudy testified that he observed Singer "hiding in a tree line next to a cornfield[,]" about 150 yards from the residence, talking on the phone to Trooper Wardrop. *Id.* at 26. Trooper Rudy then chased Singer behind the tree line into a cornfield. *Id.* When Singer later appeared at the residence, Trooper Rudy chased Singer into the yard of another residence. *Id.* at 28. Trooper Rudy also testified that later, Singer again fled into a wooded area, eventually being taken into custody in a "real thick brush patch." *Id.* at 30.

In his testimony, Corporal Dabrowski stated that about 150 yards from the trailer,

> there was a small wooded area. There's actually a couple other residences scattered[,] or cabins or something[,] scattered throughout there. As we're walking towards this cornfield, there's an open area and there's a road and then there's a tree line. On the other side of the tree line is a big cornfield.

*Id.* at 35. According to Corporal Dabrowski,

> … I think we both gave him verbal commands to come out of the wood line. You know, drop the hatchet. At that point[,] he

- 10 -

picked the hatchet up, told us to stay away, and then … you could hear him running through the brush.

And there's like a little gully there or whatever to catch water, so we didn't pursue him through that. It was rather thick. You could hear him running, and we realized the other side was cornfield, and the corn at that time was probably seven feet high.

So then … I decided I would flank the hedge row in case he came back out. There was an open area. Trooper Rudy and the young man, I don't know his name, went around. They had to actually go around the hedge row where the cornfield began to go inside the cornfield [*sic*].

*Id.* at 36. Trooper Rudy also described "a privacy fence that surrounds the trailer, probably six foot white privacy fence[.]" *Id.* at 37.

The above evidence, even taken in a light most favorable to the Commonwealth, fails to establish that the troopers had probable cause to arrest Singer for disorderly conduct and/or public drunkenness. Specifically, the Commonwealth failed to present evidence that Singer appeared in "public", as that term relates to those offenses. Because the evidence is not sufficient to establish the lawfulness of Singer's arrest, his conviction of resisting arrest cannot be sustained. *See Jackson*, 924 A.2d at 620. As the evidence is not sufficient to sustain either of Singer's convictions, we vacate Singer's judgment of sentence.

Judgment of sentence vacated; Singer is discharged.

J-A18040-15

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/28/2015