**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| JARED D. ENGLEMAN | |
| Appellant | No. 1320 MDA 2014 |

Appeal from the Judgment of Sentence of May 5, 2014
In the Court of Common Pleas of Berks County
Criminal Division at No.: CP-06-CR-0003668-2011

BEFORE:  SHOGAN, J., WECHT, J., and STRASSBURGER, J.[*]

DISSENTING MEMORANDUM BY WECHT, J.:     **FILED DECEMBER 08, 2015**

Jared Engleman challenges, *inter alia*, the sufficiency of the evidence offered by the Commonwealth to support his conviction for criminal conspiracy to commit persons not to possess, use, manufacture, control, sell, or transfer firearms.[1]  For the reasons set forth herein, in my view, the evidence was insufficient as a matter of law to sustain that conviction. Because the learned Majority concludes otherwise, I respectfully dissent.

The following represents a summary of the evidence offered by the Commonwealth at Engleman's March 6, 2014 jury trial.

---

[*]     Retired Senior Judge assigned to the Superior Court.

[1]     ***See*** 18 Pa.C.S. §§ 903; 6105.

On June 29, 2011, Lieutenant Adam Kosheba of the Pennsylvania State Police, along with other members of various law enforcement agencies, arrested an individual by the name of Matthew Conner. When Matthew Conner was arrested, Lt. Kosheba seized a fully loaded Norinco MAK-90 Sporter 7.62 by 39 millimeter caliber semi-automatic rifle that was located at Conner's feet. This particular weapon is a derivative of the more common AK-47 assault rifle, and is often referred to as an AK-47, which is how the weapon was referred to at Engleman's trial. Matthew Crouse, a juvenile probation officer, confirmed that Matthew Conner had been adjudicated delinquent of burglary as a juvenile, and, therefore, could not legally possess a firearm.

On July 1, 2011, Trooper Robert Norton of the Pennsylvania State Police went to Engleman's Auto Body shop, where he spoke with Engleman. During the discussion, Engleman told Trooper Norton that he had known Matthew Conner since they were both thirteen years old. Engleman stated that he and Conner were friends, but that they had not spoken much because Conner had moved to Hawaii. Before Conner moved away, Engleman frequently would go to a shooting range with Conner, sometimes accompanied by Conner's father, Maurice Conner. Matthew Conner would shoot either his father's firearms or firearms that belonged to his friends. He never brought his own weapons to shoot.

Engleman described Matthew Conner as having mental instabilities. Engleman also told Trooper Norton that Matthew Conner was heavily

interested in firearms and in shooting firearms. According to Engleman, Matthew Conner was into violent things and violent topics. Engleman told Trooper Norton that he assumed that Matthew Conner was not permitted to possess a firearm due to certain incidents in Conner's past, including an incident during which Conner fired a weapon at police officers. That incident had led to Conner's placement in a mental institution.

Trooper Norton asked Engleman whether he had ever purchased any firearms. Engleman admitted that he had bought at least four different weapons, including an AK-47. Engleman claimed that he had held onto the AK-47 for approximately two years, and had then sold it to Maurice Conner, Matthew Conner's father. The transaction occurred in either 2005 or 2006. Engleman stated that the transaction occurred face-to-face with Maurice Conner outside of Maurice Conner's home. Engleman could not recall whether he had provided Maurice Conner with a receipt for the purchase, but noted that it was his typical practice to issue a handwritten receipt when he sold a gun.

On August 19, 2011, Trooper Norton returned to Engleman's Auto Body with fellow State Trooper Robert Hess, and arrested Engleman. The troopers later advised Engleman of his constitutional rights pursuant to ***Miranda v. Arizona***,[2] after which Engleman agreed to speak with the

---

[2] ***See Miranda v. Arizona***, 384 U.S. 436 (1966).

troopers. The troopers first discussed with Engleman a .17 caliber rifle that Engleman also had sold to Maurice Conner. During the investigation of this case, law enforcement found a handwritten receipt confirming the sale of this particular weapon from Engleman to Maurice Conner at Maurice Conner's home. Engleman admitted during this interrogation that he had written that receipt. With regard to the AK-47, Engleman rejected the troopers' suggestion that Engleman had sold the weapon to Matthew Conner to give to his father, Maurice Conner. Engleman stated that he believed that the transaction was between himself and Maurice Conner only. He insisted that he never sold or loaned the AK-47 to Matthew Conner.

Trooper Robert Hess was present for the interview with Engleman regarding the .17 caliber weapon. Trooper Hess testified that Engleman admitted that Matthew Conner had asked him about the sale of that weapon, and that Engleman insisted that he sold that particular weapon to Maurice Conner. Notably, the .17 caliber rifle is not the AK-47 type weapon at issue at Engleman's trial. Engleman was not charged with any offenses related to the .17 caliber rifle. Engleman was shown the handwritten receipt for that weapon, and conceded that the receipt was for the .17 caliber weapon, and that he had written the receipt. Engleman told Trooper Hess that he had given the receipt to Matthew Conner to provide to his father, Maurice Conner. Regarding the AK-47, Engleman told Trooper Hess that the transaction was a face-to-face transaction with Maurice Conner. Trooper Hess later executed a search warrant at Maurice Conner's home, which

produced the receipt for the .17 caliber weapon, as well as receipts for other weapons, but no receipts for the AK-47.

Despite the fact that the handwritten receipt for the .17 caliber weapon was found at his home, Maurice Conner asserted that, prior to June 29, 2011, he had never met or heard of Engleman. Maurice Conner stated that he had never seen Engleman at his home before that date, and had never had any conversations with him. Maurice Conner claimed that he had seen Engleman's vehicle on the property, but never Engleman himself.

Paul Foster knew both Engleman and Matthew Conner from high school. After high school, Foster, who is a banker by trade, also became a federally licensed firearms dealer. On one occasion, Foster was at a shooting range when Matthew Conner entered the range carrying a Norinco MAK-90 AK-47. Foster estimated that this incident occurred anywhere from one to three years before Matthew Conner was arrested. Foster looked at and handled the weapon. Foster noted that the stock of the weapon that Matthew Conner brought to the range was different from the one that the Commonwealth had introduced at trial. However, Foster informed the jury that the stock could be changed with a screwdriver, and that it is easy to do so.

Holly Young, an inmate at the state prison for women at Cambridge Springs who is Matthew Conner's former girlfriend, recounted an incident that occurred at some point prior to 2007, which is when Young dropped out of high school. Young, Engleman, and Matthew Conner were smoking

marijuana in the back of a van that was parked beside Matthew Conner's house. While they were smoking the marijuana, Matthew Conner asked Engleman for protection from bears that live in the Hawk Mountain, Pennsylvania, area. Engleman merely replied that he would look into it. Young never heard any other talk about the so-called protection, and never witnessed any exchange of weapons between Engleman and Matthew Conner.

Young noted that the incident had recently been refreshed in her memory after she talked with a Pennsylvania State Trooper while she was imprisoned after she reviewed her testimony with the assistant district attorney. She conceded that she has trouble remembering events and dates due to a prolonged drug addiction, a disease that ultimately led to her incarceration, and that the details of her story often change due to the memory lapses caused by her addiction. For example, although Young initially stated that the discussion with Matthew Conner and Engleman had occurred in 2007, she later claimed that it had occurred in 2009.

Steven Engle testified for the defense. Engle considers himself one of Engleman's close friends. At some point, Engleman moved in with Engle. When Engleman moved in, he no longer had the AK-47. Engle, who is an aficionado of weapons, had wanted to purchase that weapon from Engleman. Engle asked Engleman about the AK-47, but Engleman explained to him that he had already sold it to Maurice Conner. Engle denied that he had told the police that Engleman was scrambling to find paperwork to prove that he had

sold the AK-47 to Maurice Conner, and denied ever saying that Engleman might have sold the weapon to Matthew Conner.

Engleman testified at trial in his own defense. Engleman recalled purchasing the AK-47 in 2004. He testified that he sold that weapon at some point in 2005, a year to a year-and-a-half after he bought it. Engleman insisted that he sold the weapon to Maurice Conner, not Matthew Conner. Engleman stated that he had not seen the weapon since selling it to Maurice Conner. Engleman also claimed that he did not know that Matthew Conner had been adjudicated delinquent of burglary until the police questioned him in this case. Engleman testified that he did not know that Matthew Conner was ineligible to own a firearm. Engleman also denied ever being in a van with Matthew Conner and Holly Young, and, accordingly, denied ever making the statement that he would look into helping Matthew Conner with protection from bears.

Upon this record, Engleman was convicted of criminal conspiracy to commit persons not to possess a firearm. Notably, Engleman was acquitted of sale or transfer of firearms to an ineligible person. *See* 18 Pa.C.S. § 9111(g)(2). On May 5, 2014, the trial court sentenced Engleman to twenty-four to forty-eight months' incarceration, which fell within the aggravated range of the sentencing guidelines, and determined that Engleman was eligible for boot camp. Engleman filed timely post-sentence motions, which were denied on July 16, 2014. Engleman filed a timely notice of appeal, which prompted the trial court to direct Engleman to file a concise statement

of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). On August 21, 2014, Engleman timely filed a concise statement. On September 11, 2014, the trial court issued an opinion pursuant to Pa.R.A.P. 1925(a).

Engleman raises the following five questions for our review:

1. Whether the lower court committed an error of law and/or abused its discretion when it failed to grant [Engleman's] Post-Sentence Motion in the nature of a Motion for Judgment of Acquittal and/or when it allowed the case to proceed to verdict, where the Commonwealth's evidence did not prove *scienter* beyond a reasonable doubt?

2. Whether the lower court committed an error of law and/or abused its discretion when it failed to grant [Engleman's] Post-Sentence Motion in the nature of a Motion for Judgement of Acquittal and/or when it allowed the case to proceed to verdict, by admitting certain prejudicial and irrelevant evidence on the issue of [Engleman's] *scienter* and/or by providing improper and erroneous instructions to the jury on said issue?

3. Whether the lower court committed an error of law and/or abused its discretion when it failed to grant [Engleman's] Post-Sentence Motion in the nature of a Motion for Judgment of Acquittal and/or when it allowed the case to proceed to verdict, over [Engleman's] timely objection, where the Commonwealth offered no evidence showing the precise date of the transfer of the subject firearm from [Engleman] to Matthew Conner and/or Maurice Conner as such evidence was critical to prove *scienter*, *i.e.*, [Engleman's] state of mind and knowledge **at the time of the transfer**, and where such evidence was necessary to satisfy the Commonwealth's burden of proving this is a timely prosecution under the applicable statute of limitations?

4. Whether the lower court committed an error of law and/or abused its discretion when it failed to grant [Engleman's] Post-Sentence Motion in the nature of a Motion for Judgment of Acquittal and/or when it failed to grant [Engleman's] Motion for Arrest of Judgment and/or motion timely made at

trial and/or [Engleman's] Omnibus Pretrial Motion based on the time-bar of the applicable statute of limitations?

5. Whether the lower court committed an error of law and/or abused its discretion when it failed to grant [Engleman's] Motion to Modify Sentence, and to vacate [Engleman's] sentence when, at [Engleman's] sentencing hearing, it accepted into evidence testimony from various individuals regarding the death of Deputy Sheriff Kyle Pagerly, in that such evidence was an impermissible factor in imposing sentence, in the admission of such evidence was inconsistent with several prior pretrial rulings of the lower court, and in that the admission of such evidence violated [Engleman's] due process guarantees?

Brief for Engleman at 14 (emphasis in original).

The crux of Engleman's appeal to this Court is that the Commonwealth failed to produce sufficient evidence to prove Engleman guilty of criminal conspiracy beyond a reasonable doubt. In his brief, Engleman summarizes his sufficiency of the evidence challenge as follows:

The Commonwealth introduced no evidence whatsoever showing a direct transfer of the subject firearm from [Engleman] to Matthew Conner. The Commonwealth did not even prove that [Engleman] transferred the firearm to Maurice Conner as this testimony was elicited on direct examination of [Engleman] during [Engleman's] case. The only evidence regarding the transfer of the firearm came from [Engleman] himself, who testified that he transferred the firearm to Maurice Conner in 2005. This was the only evidence offered at trial regarding the actual transfer of the AK-47.

To support a finding of conspiracy herein, the Commonwealth had to necessarily prove, beyond a reasonable doubt, that –**at the time of the transfer of the firearm to Maurice Conner**-- [Engleman] was aware that Maurice Conner intended to give the firearm to Matthew Conner **and** that [Engleman] was aware that Matthew Conner was ineligible to possess a firearm. The ultimate provision of the firearm to Matthew Conner could be the only illegal object of the conspiracy; otherwise, the transaction

between [Engleman] and Maurice Conner would be nothing more than a legal transfer as there would be no "criminal intent."

Brief for Engleman at 21 (emphasis in original; footnote omitted). For the reasons that follow, I agree with Engleman that the Commonwealth did not prove a criminal conspiracy beyond a reasonable doubt, even when viewing the evidence in the light most favorable to the Commonwealth.

A claim challenging the sufficiency of the evidence presents a question of law. *Commonwealth v. Widmer*, 744 A.2d 745, 751 (Pa. 2000). We must determine "whether the evidence is sufficient to prove every element of the crime beyond a reasonable doubt." *Commonwealth v. Hughes*, 555 A.2d 1264, 1267 (Pa. 1989). We "must view evidence in the light most favorable to the Commonwealth as the verdict winner, and accept as true all evidence and all reasonable inferences therefrom upon which, if believed, the fact finder properly could have based its verdict." *Id.*

Our Supreme Court has instructed:

[T]he facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Ratsamy*, 934 A.2d 1233, 1236 n.2 (Pa. 2007).

A conviction for criminal conspiracy requires proof of:

> (1) an intent to commit or aid in an unlawful act, (2) an agreement with a co-conspirator and (3) an overt act in furtherance of the conspiracy. Because it is difficult to prove an explicit or formal agreement to commit an unlawful act, such an act may be proved inferentially by circumstantial evidence, *i.e.*, the relations, conduct or circumstances of the parties or overt acts on the part of the co-conspirators.

***Commonwealth v. Galindes***, 786 A.2d 1004, 1010 (Pa. Super. 2001) (quoting ***Commonwealth v. Spotz***, 756 A.2d 1139, 1162 (Pa. 2000)). Circumstantial evidence can include, but is not limited to, the relationship between the parties, the knowledge of and participation in the crime, and the circumstances and conduct of the parties surrounding the criminal episode. ***Commonwealth v. French***, 578 A.2d 1292, 1294 (Pa. Super. 1990). "These factors may coalesce to establish a conspiratorial agreement beyond a reasonable doubt where one factor alone might fail." ***Id.***

Thus, a conviction for conspiracy requires only an intent to commit a crime, an agreement with a co-conspirator, and an overt act in furtherance of the conspiracy. ***Galindes***, 786 A.2d at 1010. "Conspiracy to commit a crime and the underlying crime itself are two entirely separate offenses with separate elements required for each." ***Commonwealth v. Johnson***, 719 A.2d 778, 791 (Pa. Super. 1998). Thus, the relevant inquiry is not whether anyone, be he Matthew Conner or anyone else, actually committed the crime of persons not to possess a firearm. The inquiry is only whether the Commonwealth proved that Engleman conspired with someone to commit that crime. I would hold that the Commonwealth did not do so.

Two facts in this case are indisputable. First, Engleman purchased the AK-47 in 2004. Second, when Matthew Conner was arrested in 2011, that firearm was located at his feet. What was not proven beyond a reasonable doubt is how that firearm matriculated from Engleman to Matthew Conner in those seven years. There is no evidence, circumstantial or otherwise, proving that Engleman provided the firearm to Matthew Conner. The record is devoid of any evidence to prove when or how the weapon came into Matthew Conner's possession. Engleman claimed that he sold the weapon to Maurice Conner in 2005. Maurice Conner insisted that he had never even met Engleman, although receipts created in Engleman's own handwriting were found in Maurice Conner's home for weapons that Maurice Conner possessed. One of these two men lied at trial. Regardless of who provided the more accurate version of events, there is nothing in the record to establish how and when Matthew Conner took possession of the AK-47.

Regardless of this gap in the factual history of this case, the necessary inquiry is whether Engleman entered into an illicit agreement either with Maurice or Matthew Conner with the intent of Matthew Conner ending up in possession of the weapon. That Engleman and Matthew Conner were at one time friends, that they were seen at a firing range together, or that Engleman once owned the weapon, do not prove the existence of a conspiratorial agreement for Matthew Conner to possess the weapon in question. Similarly, Paul Foster's testimony that he saw Matthew Conner with a similar weapon with a different stock does not prove that Engleman at

some point agreed to provide his AK-47 to Matthew Conner. It proves only that Matthew Conner was shooting an AK-47 with a different stock. Moreover, that the stock of those weapons **can** easily be changed, does not mean that the stock **was** changed in this case. It does not prove that this is what occurred in this case, or that Engleman provided Matthew Conner with the AK-47 and that Conner changed the stock to hide the transaction. Such a conclusion is not a reasonable inference flowing from the facts. It is pure guesswork.

The only testimony that comes close to evidence that at some point Engleman agreed with either Maurice or Matthew Conner with a criminal objective of Matthew Conner ending up in possession of the AK-47 came from Holly Young, a state prison inmate with significant memory lapses due to her drug addiction. Despite Young's obvious credibility challenges, only the substance of her testimony is relevant, because this is a challenge to the sufficiency of the evidence, not the weight of the evidence. The jury was free to believe Young's testimony. Nonetheless, Young's testimony does not amount to proof beyond a reasonable doubt.

Young testified that, in either 2007 or in 2009, she was smoking marijuana in a van with Engleman and Matthew Conner. She stated that, due to his fear of bears in the area, Matthew Conner asked Engleman for protection. In response, she claimed, Engleman uttered that he would look into it. This vague statement, recalled by a drug-addicted prison inmate with memory problems, hardly constitutes proof beyond a reasonable doubt

of a conspiratorial agreement. In fact, Engleman agreed to nothing more than exploring the possibility of helping to protect Matthew Conner. He did not explicitly agree to provide Matthew Conner with a weapon. This conversation occurred two to four years before the crime was committed, and contained no details or commitments that would enable a fact-finder to conclude, from that vague statement, that Engleman and Conner shared a criminal intent to achieve a certain objective. At best, the statement serves as some indicia that some agreement might come to fruition in the future. By itself, it is not proof beyond a reasonable doubt that an agreement was conceived then, or ever did occur.

Engleman once owned the AK-47. Seven years later, Matthew Conner had that weapon. The Commonwealth failed to adduce sufficient evidence of what occurred between those events. Engleman's vague statement made sometime within that time frame does not establish a conspiracy between him and Matthew Conner. Nor is there anything in the record to suggest that Engleman conspired with Maurice Conner to provide the AK-47 to Matthew Conner. In fact, Maurice Conner, the Commonwealth's own witness, alleged that he never even met Engleman. The evidence was insufficient to establish a conspiracy.

I would vacate Engleman's judgment of sentence, and order Engleman to be discharged. In light of that disposition, I would not review any other of Engleman's arguments. I respectfully dissent.