# [J-69-2024]
# IN THE SUPREME COURT OF PENNSYLVANIA
# WESTERN DISTRICT

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, McCAFFERY, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 34 WAP 2023 |
| | : | |
| Appellee | : | Appeal from the Order of the |
| | : | Superior Court entered June 22, |
| | : | 2023, at No. 519 WDA 2022, |
| v. | : | Reversing the Order of the Court of |
| | : | Common Pleas of Allegheny County |
| | : | entered April 18, 2022, at No. CP- |
| KEITH LAMAR FOSTER, | : | 02-CR-006450-2021, and |
| | : | remanding. |
| Appellant | : | |
| | : | ARGUED: October 10, 2024 |

## OPINION

**JUSTICE McCAFFERY**                                    **DECIDED: MARCH 20, 2025**

Our criminal justice system tolerates some degree of police subterfuge during investigative interviews. This typically involves telling a suspect that a co-defendant implicated them in the crime when no such statement was made, or that police recovered evidence implicating the suspect, when, in fact, they have not.[1] Regardless of the specific misrepresentation, both this Court and the United States Supreme Court have long held that a suspect's ensuing inculpatory statement is admissible at trial so long as it was made voluntarily under the totality of the circumstances — that is, it was the product of the

---

[1] *See Frazier v. Cupp,* 394 U.S. 731, 737-738 (1969); *Commonwealth v. Jones*, 322 A.2d 119, 126 (Pa. 1974); *Commonwealth v. Williams*, 640 A.2d 1251, 1259 (Pa. 1994).

defendant's "free and unconstrained choice." *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973); *Commonwealth v. Nester*, 709 A.2d 879, 882 (Pa. 1998).

In this appeal by permission, we consider whether the investigating detective's opening statement to appellant Keith Lamar Foster (Foster) that he was not a suspect, when in fact the detective had already obtained a search warrant for his DNA, so misrepresented the nature of their interaction as to render Foster's subsequent statement involuntary under the totality of the circumstances test prescribed by the Fifth Amendment of the United States Constitution.[2] We agree with the Superior Court that, under the circumstances present here, the misrepresentation, itself, did not outweigh the non-coercive, voluntary nature of the interview. In other words, we hold that a misrepresentation to an interviewee that he is not a suspect, when in fact police consider him a suspect, does not, *per se*, transform a voluntary statement into an involuntary one under the Fifth Amendment. Thus, we affirm the order of the Superior Court.

The relevant facts underlying Foster's suppression claim are as follows.[3] At approximately 10:00 p.m. on the evening of January 25, 2019, K.C. (Victim) drove to Preeti's Pit, a bar in the Strip District of Pittsburgh, where she met two friends. Over the next few hours, she had three mixed drinks, which she claimed made her feel more intoxicated than usual. Although she recalled leaving the bar, Victim did not remember driving her car and had no recollection of how she got home.

Victim woke up the next morning in her bed with her boyfriend. After realizing her car was missing, she contacted the staff at Preeti's and learned that she had crashed her

---

[2] As explained *infra*, we review this matter only under the federal constitution since Foster waived a separate challenge to the voluntariness of his statement under Article I, Section 9 of the Pennsylvania Constitution.

[3] As this case was appealed by the Commonwealth following the grant of Foster's suppression motion, we glean the relevant facts from the preliminary hearing, the suppression hearing, and the parties' motions.

car about two blocks from the bar. Because she "didn't feel right," had vaginal pain, and her boyfriend told her they did not have sex the night before, Victim went to the hospital and requested a sexual assault examination. N.T., 8/26/2021, at 8. Although the incident was reported to the police, the investigation stalled because Victim was unsure whether she had been sexually assaulted.

However, in May of 2020, when Victim's lab results revealed the presence of unknown male DNA, Pittsburgh Police Detective Bryan Sellers was assigned to investigate the case. After interviewing Victim's friends and other people who were at the bar on the night in question, Detective Sellers learned that Foster worked at Preeti's and after leaving work, he was the person who found Victim in her crashed car. Foster claimed Victim was visibly intoxicated; therefore, he drove her back to Preeti's, and left her with staff members, who ordered a Lyft to take her home.

Detective Sellers arranged to interview Foster. When Foster did not show up on the scheduled date, the detective made several unsuccessful attempts to contact him. Recognizing that Foster was purportedly alone with Victim during some part of the evening in question, Detective Sellers applied for a search warrant for Foster's DNA. Meanwhile, Foster learned the police wanted to talk to him, so he contacted the detective to arrange a meeting.

On November 2, 2020, Foster voluntarily traveled to the Pittsburgh Police Headquarters to meet with Detective Sellers. Earlier that same day, the detective had applied for a second search warrant, since the first one had expired.

Once Foster arrived, Detective Sellers escorted him into an interview room before leaving for a few minutes.[4] Foster was not handcuffed or restrained and was in

---

[4] Foster's interview with the detective was videotaped and is included in the certified record.

possession of a water bottle and his cell phone. In fact, he talked to someone on his cell phone while he waited for the detective to return. After exchanging a few pleasantries, Detective Sellers told Foster: "I appreciate you coming in. … Like I told you over the phone, like right now **you're not a suspect**. … I'm just trying to talk to everybody that [Victim] encountered." Video Interview, 11/2/2020, at 12:44:18-12:44:39 (emphasis added). At that point, Foster asked for a tissue. Detective Sellers briefly left the room, returned shortly thereafter with a tissue, and then left again to answer a phone call. During that time, the interview room door remained open. Detective Sellers returned approximately three minutes later, and again told Foster he was not a suspect:

> Like I explained, I mean, you're, **right now you're not a suspect**. Okay. … I'm just trying to track down everybody [Victim] … came in contact with and, … just talk to them, okay. Um. I talked to … seven people, I still have you, … and there's like two or three more people. … If at any time though, you know based on how this goes, if, if it does come down to … there might be something there, we'll stop the interview and then I'll read you your rights. And then you can make that decision.

*Id.* at 12:47:59-12:48:39 (emphasis added).

The interview proceeded with some background information before Detective Sellers asked Foster about his recollection of the night in question. At all times, the tone of the interview was conversational, and Detective Sellers never acted in an accusatory manner. Foster told the detective that he had been working at Preeti's that night, and, after he left, he encountered Victim in her crashed car. Foster described her as intoxicated and argumentative. He stated he was able to coax Victim out of her car, and drove her back to the bar, where he left her with other staff before going home. Towards the end of the interview, Detective Sellers asked Foster if he had "ever been physical" or "had sex before" with Victim. Video Interview at 12:59:22-12:59:31. Foster responded "No" to both questions. *Id.* Detective Sellers then asked Foster to provide a DNA sample. He stated:

> So what I've been doing is … I've been getting DNA samples. Cause she went to the hospital and had a rape kit done. And what I need is from her boyfriend, um, from the Lyft driver and from you. Is it okay if I would get your DNA?

*Id.* at 12:59:56 -13:00:25. Foster replied, "Yes." *Id.* at 13:00:25.

Detective Sellers explained the process of obtaining a buccal swab and assured Foster that his DNA sample would only be used for the present case; if it came back negative, it would be destroyed. At that point, Detective Sellers admitted to Foster that he "actually [had] a search warrant" for him. Video Interview at 13:01:04. The detective clarified that he applied for the initial warrant while he was trying to locate Foster, and since that warrant had expired, he applied for a second warrant earlier that day. Detective Sellers told Foster he could wait until the new warrant was signed by a judge, or he could simply agree to proceed with the buccal swab based on the expired warrant. Foster elected to proceed immediately. The entire interview, including the buccal swab, lasted approximately 25 minutes.

After the lab results indicated Foster's DNA matched the unknown male DNA from the rape kit, Foster was arrested and charged with one count each of rape of an unconscious person and sexual assault.[5] On November 1, 2021, Foster filed an omnibus pretrial motion seeking suppression of his statements to Detective Sellers, which he claimed were obtained during the course of a custodial interrogation absent the requisite *Miranda*[6] warnings. He asserted generally that the statements were "obtained in violation of [his] rights under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution, as well as Article One, Sections Eight and Nine of the Pennsylvania Constitution." Omnibus Pre-Trial Motion, 11/1/2021, at 3. The Commonwealth filed a brief in opposition, arguing that Foster was not in police custody at the time of the

---

[5] *See* 18 Pa.C.S. §§ 3121(a)(3), 3124.1.

[6] *Miranda v. Arizona*, 384 U.S. 436 (1966).

interview (thus, no *Miranda* warnings were required), and, in any event, his statements were voluntary. Foster responded in a reply brief that his statement was not the product of a free and unconstrained choice to speak to Detective Sellers because the detective "misrepresented the fundamental nature of the interaction" by telling Foster he was not a suspect. Reply Brief in Support of Motion to Suppress, 3/29/2022, at 9.

The suppression court conducted a bifurcated hearing. On February 15, 2022, the court heard testimony from Detective Sellers and viewed the videotaped interview. Although the court indicated it was inclined to grant Foster's motion, it permitted the parties to brief the issue, and scheduled additional oral argument for April 19th. Following that argument, the suppression court entered an order granting Foster's motion to suppress any statement he made prior to being issued *Miranda* warnings.

The court determined that Detective Sellers' misrepresentation to Foster that he was not a suspect, when in fact the detective had already obtained a search warrant for his DNA, deprived Foster of his ability to make a "free and unconstrained choice to undergo an interview relative to the [alleged] sexual assault of" Victim. Suppression Court Opinion at 2. In response to the Commonwealth's claim that Foster was simply one of a few men who were known to have been alone with Victim on the night of the alleged assault, the suppression court emphasized that Detective Sellers attested Foster was a "viable suspect" in the probable cause affidavit accompanying the warrant application. N.T., 4/18/2022, at 14; *see also* N.T., 2/15/2022, at 19. Nevertheless, the court stated it did not believe Detective Sellers was "trying to be a wise guy," but instead "misunderstood what he was doing." N.T., 4/18/2022, at 14-15; *see also*, N.T., 2/15/2022, at 30-31 ("I do not challenge the detective's good faith. I believe he was acting in good faith based on his understanding of what was happening."). In the suppression court's view, Detective Sellers' statement to Foster that he was "not a suspect," before expecting him to "make

a valid decision on asserting [his] rights or not," was "a different kind of misrepresentation that goes to the voluntariness of the statement." N.T., 4/18/2022, at 15.

Consequently, the suppression court found Foster's "decision to speak with Detective Sellers was borne solely from [the detective's] affirmative misrepresentation that [Foster] was not a suspect in [the] sexual assault[,]" and not the "product of an informed and conscious choice." Suppression Court Opinion at 3. Additionally, without explicitly addressing Foster's *Miranda* claim, the court indicated that it did not believe Foster was in custody at the time of the interview. *See id.* at 2 ("[Foster] was not restrained or informed that he was not permitted to leave and the interview did not appear coercive.").

The Commonwealth filed a timely, interlocutory appeal to the Superior Court, which reversed the suppression ruling and remanded for further proceedings. *See Commonwealth v. Foster*, 301 A.3d 923 (Pa. Super. 2023) (unpub. memo. at *8). The Superior Court first recited its standard of review — noting it defers to the suppression court's findings of fact and credibility determinations but not to the court's legal conclusions. *Id.* at *2 (citation omitted). Relying primarily upon a prior Superior Court decision, *Commonwealth v. Roberts*, 969 A.2d 594 (Pa. Super. 2009),[7] the panel

---

[7] In *Roberts*, police obtained a confession from a defendant after informing him, in good faith, that he could not be prosecuted for the crime because the statute of limitations had expired. *See Roberts*, 969 A.2d at 596. However, when it was later determined that the limitations period was tolled, the Commonwealth filed charges against him and the defendant moved to suppress his statement. *See id.* at 597. The trial court suppressed the statement and the Commonwealth appealed to the Superior Court, which reversed the suppression order and remanded the matter for trial. The Superior Court concluded that, under the totality of the circumstances — which included a non-coercive interview in the defendant's home, and the officers' "good faith reliance on information that later proved to be incorrect" — the defendant's confession was voluntary. *Id.* at 599-600. Ultimately, the panel determined the circumstances were not "so inherently coercive as to deprive [the defendant] of his free will" and the officers' mistaken statement "was more likely to cause a trustworthy confession rather than an untrustworthy confession[.]" *Id.* at 600-601 (emphases omitted). The decision was not appealed to this Court.

observed that the proper test for determining whether a statement is voluntary is the totality of the circumstances. *See Foster*, 301 A.3d at *4-*7. The Court noted that this test involves consideration of factors such as the duration and conditions attendant to the interview, and the attitude of the interviewer, as well as any other factors "that could drain a person's ability to withstand coercion." *Id.* at *5 (*citing Roberts*, 969 A.2d at 599).

The Superior Court first refuted the Commonwealth's assertion that the suppression court did not consider any of the pertinent circumstances surrounding the interview. *See Foster*, 301 A.3d at *7. Rather, the panel observed the court "recognized that Foster was not restrained or informed that he was not permitted to leave, and the interview did not appear coercive." *Id.* (citation and some punctuation omitted). Nevertheless, the suppression court did not refer to the duration or conditions of the interview, or "Foster's psychological state[.]" *Id.* Upon its consideration of all the relevant factors, the Superior Court opined:

> In sum, it is apparent that Foster willingly came to the police station for the interview. He was not handcuffed or locked in the room, he was permitted to use his cell phone during the five minutes he waited for the interview to commence, and the duration of the interview was brief. The [suppression] court expressly found that Detective Sellers' manner and demeanor during the interview was not coercive. The totality of these circumstances establish that Foster's statements were voluntary.

*Id.* (citation omitted).

The panel further disputed the suppression court's conclusion that Detective Sellers' misrepresentation to Foster that he was not a suspect, itself, rendered his statement involuntary. *See Foster*, 301 A.3d at *8. Indeed, the panel referred to its prior decision in *Roberts*, and this Court's ruling in *Commonwealth v. Hughes*, 555 A.2d 1264 (Pa. 1989) — asserting that in both cases, the defendant's statement was deemed voluntary despite much more coercive circumstances than those present here. *See Foster*, 301 A.3d at *8; *see also Hughes*, 555 A.2d at 1268-1269, 1273-1274 (confession

admissible despite the fact that minor suspect's interview lasted for hours, involved two crimes, and police told suspect he failed polygraph test when result was inconclusive); *Roberts*, 969 A.2d at 595-597, 599-601 (confession admissible even though officers mistakenly informed defendant that he could not be prosecuted because statute of limitations expired). Accordingly, under the totality of the circumstances surrounding Foster's interview with Detective Sellers, the Superior Court concluded the statement was voluntary and the suppression court erred by granting Foster's motion to suppress.[8] *Foster*, 301 A.3d at *8.

Foster petitioned this Court for allowance of appeal, which we granted, rephrasing the issue as follows:

> Whether, under the applicable totality of the circumstances test, the detective's representation to [Foster] that he was not a suspect rendered [Foster's] subsequent statement involuntary?

*Commonwealth v. Foster*, 310 A.3d 718 (Pa. 2023) (*per curiam*).[9]

---

[8] In a footnote, the Court acknowledged that Foster also sought suppression of his statement on the basis that he was subject to a custodial interrogation and was not advised of his *Miranda* warnings. *See Foster*, 301 A.3d at *7 n.3. The panel determined that Foster did not develop that argument in his appellate brief, and, even if he had, it would conclude he was not subject to a custodial interrogation. *See id.*

[9] While this claim arises from Foster's federal constitutional protection against self-incrimination, Foster presents a second issue in his brief, arguing that, if we conclude he is not entitled to relief under the federal constitution, we should find Article I, Section 9 of the Pennsylvania Constitution provides "greater protection than its federal counterpart" and "proscribe[s] police from lying about the nature of [their] interaction" with a potential suspect. Foster's Brief at 25. He and Amicus Pennsylvania Association of Criminal Defense Lawyers (PACDL) present a compelling argument that we should consider providing greater protection against police manipulation during interrogations under the Pennsylvania Constitution.

Recognizing that to date, this Court has not interpreted Article I, Section 9 as providing "any greater protection than" the Fifth Amendment with regard to a defendant's inculpatory statement, Foster engages in an *Edmunds* analysis. *See* Foster's Brief at 25 n.4; *Commonwealth v. Edmunds*, 586 A.2d 887 (Pa. 1991). He argues: (1) this Court has previously held that, despite similar language, "Section 9 can provide greater
(continued…)

When reviewing a challenge to a suppression court ruling, we are "limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct." *Commonwealth v. Yandamuri,* 159 A.3d 503, 516 (Pa. 2017) (citation omitted). We review questions of law *de novo* but defer to the suppression court's factual findings when they are supported by the record. *See id.*

A defendant's confession or inculpatory statement is not admissible at trial unless it was made **voluntarily**. This mandate is grounded in both the Fifth Amendment's right

---

protection than the Fifth Amendment[;]" (2) other states have determined that police misrepresentations about the nature of an interview may lead to an involuntary statement; and (3) the "risk of false confessions, and relatedly, wrongful convictions will necessarily decline" if we limit police manipulation in interviews. Foster's Brief at 32-43. Moreover, Amicus PACDL cites several scholarly articles which advocate that "the use of deception in interrogation increases the risk of eliciting false confessions." PACDL's Brief at 5, 8, 10-12, 14-15 (*citing* Richard A. Leo, *Interrogation and False Confessions in Rape Cases* (2024) (forthcoming in Ann Burgess, Ed., *Practical Aspects of Rape Investigation: A Multidisciplinary Approach* (6th ed. 2024); Margareth Etienne & Richard McAdams, *Police Deception in Interrogation as a Problem of Procedural Legitimacy*, 54 Tex. Tech. L. Rev. 21 (2021); Julia Simon-Kerr, *Public Trust and Police Deception*, 11 Ne. U.L. Rev. 625 (2019); Miriam S. Gohara, *A Lie for a Lie: False Confessions and the Case for Reconsidering the Legality of Deceptive Interrogation Techniques*, 33 Fordham Urb. L.J. 791, 835 (2006) (recommending that states pass laws prohibiting police from, *inter alia*, "outrightly misleading a suspect about the purpose of the interrogation; for example, indicating that he is a witness instead of a suspect.").

The Commonwealth, however, insists that Foster has waived this claim, and we agree. *See* Commonwealth's Brief at 30-31. Although Foster cited Article I, Section 9 in his suppression motion, and repeated the citation in his appellee brief before the Superior Court, he did not develop any argument (before either lower court) that the Pennsylvania Constitution provides greater protection against self-incrimination than its federal counterpart. And, significantly, he did not raise a departure claim in his petition for allowance of appeal. Thus, while this issue appears worthy of our review in another case, Foster has waived the claim here. *See Commonwealth v. Bishop*, 217 A.3d 833, 841-842 (Pa. 2019) (concluding that, while appellant raised departure claim under Pennsylvania Constitution in petition for allowance of appeal, appellant nevertheless waived claim when appellant did not argue issue before suppression court nor develop any reasoning before appellate court).

against self-incrimination[10] and the Fourteenth Amendment's Due Process Clause.[11] *See Dickerson v. United States*, 530 U.S. 428, 433 (2000). These substantial protections led the United States Supreme Court to issue its seminal decision in *Miranda*, which requires police officers to provide defendants with a clear recitation of their constitutional right to remain silent and their right to an attorney — and obtain a knowing and intelligent waiver of those rights — before conducting a custodial interrogation. *See Miranda*, 384 U.S. at 478-479. The *Miranda* directive was necessary because "the coercion inherent in custodial interrogation blurs the line between voluntary and involuntary statements[.]" *Dickerson*, 530 U.S. at 435. *Miranda*, however, is not at issue here. The suppression court found Foster was **not** in custody at the time of his interview — and thus not subject to a custodial interrogation — and Foster has not challenged that ruling.[12] Accordingly, our focus is on the voluntariness of Foster's statement to Detective Sellers. "The determination of whether a confession [or inculpatory statement] is voluntary is a

---

[10] U.S. Const. amend. V ("No person shall … be compelled in any criminal case to be a witness against himself[.]"). The Pennsylvania Constitution's corollary, enshrined in Article I, Section 9, similarly provides: "In all criminal prosecutions the accused … cannot be compelled to give evidence against himself[.]" Pa. Const. art. I, § 9.

[11] U.S. Const. amend. XIV ("No state shall … deprive any person of life, liberty, or property, without due process of law[.]").

[12] Nor do we find any basis for a challenge. "An individual is in custody if he is physically denied his freedom of action in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by the interrogation." *Commonwealth v. Cooley*, 118 A.3d 370, 376 (Pa. 2015) (citation and quotation marks omitted). In making this objective determination, we focus on "the totality of the circumstances with due consideration given to the reasonable impression conveyed to the individual being questioned." *Id.* (citation omitted). Here, the evidence presented during the suppression hearing, including the videotaped interview, establishes that Foster traveled to the police station voluntarily, and was led into an unlocked interview room where he was permitted to keep his phone. He was never restrained nor informed he was not free to leave. In fact, when Detective Sellers left the room to take a phone call, the door was open. Foster could have easily left the room or even the premises. Therefore, under the totality of the circumstances, we would agree Foster was not in custody at the time of the interview.

conclusion of law and, as such, is subject to plenary review." *Commonwealth v. Templin*, 795 A.2d 959, 961 (Pa. 2002) (citation omitted).

The United States Supreme Court has recognized that "[a]ny police interview of an individual suspected of a crime has coercive aspects to it." *J.D.B. v. North Carolina*, 564 U.S. 261, 268 (2011) (citation and quotation marks omitted). However, not "every element which influences a criminal suspect to make incriminating admissions" is prohibited under the Constitution. *United States v. Washington*, 431 U.S. 181, 187 (1977). The touchstone is whether the statement was voluntary under the totality of the circumstances. *See Commonwealth v. Nester*, 709 A.2d 879, 882 (Pa. 1998). In making this determination, courts do not consider "whether the defendant would have confessed without interrogation, but whether the interrogation was so manipulative or coercive that it deprived the defendant of his ability to make a free and unconstrained decision to confess." *Id.* This Court has compiled a list of relevant factors for assessing the voluntariness of a statement or confession:

> the duration and means of the interrogation; the defendant's physical and psychological state; the conditions attendant to the detention; the attitude exhibited by the police during the interrogation; … the accused's age and level of education and experience; his extent of previous experience with the police; whether the accused was advised of his constitutional rights; whether he was injured, ill, drugged, or intoxicated when he confessed; whether he was deprived of food, sleep or medical attention, and whether he was abused or threatened with abuse.

*Yandamuri,* 159 A.3d at 525 (citation omitted). Significantly, courts also may consider any "other factors that could drain a person's ability to resist suggestion and coercion." *Id.* (citation omitted). The United States Supreme Court has cautioned, however, that neither the presence nor absence of any one factor is controlling — rather these factors collectively shape the court's "careful scrutiny of all the surrounding circumstances." *Schneckloth*, 412 U.S. at 226. The burden is on the Commonwealth to prove by a

preponderance of the evidence that a defendant's statement was voluntarily made.  *See Nester*, 709 A.2d at 163.  With this background in mind, we consider Foster's argument on appeal.

Foster insists that his statement to Detective Sellers was involuntary under the totality of the circumstances.  In his view, Detective Sellers' misrepresentation — at the outset of the interview — that he was not a suspect, changed the dynamic of the interview and "shaped the police manipulation."  Foster's Brief at 22.

Once Detective Sellers "misrepresented the nature of [their] interaction[,]" Foster continues that his decision to give a statement "was not a free and unconstrained" choice.  Foster's Brief at 15.  He highlights that while Detective Sellers told him that he was **not** a suspect "at that time[, but] could become a suspect depending on what he said during the interview[,]" the detective had already applied for two search warrants (and obtained one) seeking Foster's DNA in relation to the sexual assault that was the subject of the interview.  *Id.* at 12, 16 (citation & emphases omitted).

Distinguishing the facts of his case from other decisions involving police misrepresentations during an interview, Foster maintains that Detective Sellers' misrepresentation is "fundamentally different" from those in which police lie about having evidence that implicates the defendant in the crime.  Foster's Brief at 16.  This misrepresentation — which painted Foster as a non-suspect — "necessarily influenced his decision to speak with police[.]"  *Id.* at 18.  Foster explains he was "put in a Catch-22 situation" because any statement he made would be incriminating and used against him — whether he told the detective that he did not know Victim, but it was later proven he had sex with her, or whether he admitted he had sex with Victim.  *Id.* at 17-18.

Foster insists his "status as a suspect shaped the police manipulation" and Detective Sellers' "intentional misrepresentation … went to the core dynamic" between

them.  Foster's Brief at 22.  Because he did not comprehend the nature of his interaction with the detective, Foster contends his "capacity for self-determination was critically impaired[,]" and he was unable to make a "free and unconstrained choice" whether to continue with the interview.  *Id.* at 22-23 (citation omitted).

Foster frames the totality of the circumstances surrounding his interview as follows. He concedes he travelled to the station voluntarily, believed he was free to leave, was not restrained, and was allowed to use his cell phone while waiting for the interview to commence.  *See* Foster's Brief at 23.  Foster also acknowledges the interview lasted approximately 20 minutes and concedes Detective Sellers was "not coercive."  *Id.* Nonetheless, he highlights that:  Detective Sellers contacted him "multiple" times to "secure his presence[;]" and "intentionally misrepresented … that he was not a suspect, despite the two warrants making out probable cause to take [his] DNA."  *Id.* at 23-24 (emphasis omitted).  Foster concludes that under the totality of the circumstances — and particularly the catch-all provision referring to "all other conditions present which may serve to drain one's powers of resistance to suggestion and undermine [one's] self-determination"— it is evident his statement was not voluntarily given.  *Id.* at 24; *see also Yandamuri*, 159 A.3d at 525.

Foster further declares that we should "create a 'bright line rule' prohibiting such deceit in police interrogations."  Foster's Brief at 44.  He maintains that such a rule would "greatly reduc[e] the risk of false confessions while leaving intact … accurate confessions[,]" as well as improve the integrity of the legal system.  *Id.* at 44-45.

The Commonwealth retorts that, while the suppression court referenced the proper totality of the circumstances test, it "actually used the disavowed 'but for' test, focusing only on the incorrect statement that [Foster] was not a suspect."  Commonwealth's Brief at 14.  It emphasizes that while the suppression court detected "nothing coercive in the

detective's manner, demeanor, or anything like that[,]" the court relied solely on "the fact that [Foster] had been misled about being a 'suspect'" in granting the suppression motion. *Id.* at 14-15 (citation omitted). Notably, the Commonwealth suggests that this type of misrepresentation is not likely to produce an involuntary statement — instead, it "puts the [defendant] in the driver's seat, as they have absolute control over what information they choose to disclose and are not under pressure to address any specific issue regarding their involvement, because no involvement has been implied by authorities." *Id.* at 21-22. Further, the Commonwealth emphasizes the suppression court found Detective Sellers did not act maliciously, but rather "misunderstood what he was doing." *Id.* at 22 (citation omitted).

Applying the totality of the circumstances test, the Commonwealth summarizes: Detective Sellers was not aggressive or demeaning during the interview, and acted in "good faith, albeit under some confusion as to the role of a search warrant." Commonwealth's Brief at 27. Foster appeared for the interview voluntarily, was not restrained in any way, and was informed that if he made an incriminating statement, "he would be advised of his constitutional rights." *Id.* The Commonwealth emphasizes Detective Sellers did not lead or coerce Foster into making a statement — rather, Foster "lied to avoid becoming a suspect." *Id.* at 28. Moreover, it maintains "[i]t is absolutely certain that [Foster] was not the victim of coercive police tactics designed to produce a false confession" because Foster never confessed, and DNA testing proved he lied to police. *Id.* at 29.

Amicus PACDL filed a brief in support of Foster, focusing on recent scientific studies which "demonstrate that the use of deception in interrogation increases the risk of eliciting false confessions[,]" and highlighting that "such deception is at the core of a large class of wrongful convictions." PACDL's Amicus Brief at 5, 13. PACDL asserts that

eliminating police deception in interrogations will "not reduce the number of confessions, but rather [will] reduce[] the risk of false confessions[,]" and enhance "police legitimacy." *Id.* at 10, 12. Moreover, PACDL directs our attention to several states which have enacted legislation to prevent the use of deception in juvenile interrogations. *See id.* at 20-22. Although recognizing that this Court has tolerated some police deception in its prior decisions, PACDL encourages us to end all deception in interrogations "to conform the law to [the] realities that [can] no longer be ignored."[13] *Id.* at 23.

Turning to the issue before us, there is no dispute that the voluntariness of a defendant's statement is determined by analyzing the totality of the circumstances. *See Templin*, 795 A.2d at 963-964. Moreover, some degree of police deception during an interview is tolerated, so long as it does not "offend basic societal notions of fairness" or "deprive[] the defendant of his ability to make a free and unconstrained decision to confess." *See Jones*, 322 A.2d at 126; *Nester*, 709 A.2d at 882. Foster's argument, instead, focuses on the type of deception the detective employed.

In Foster's view, when a law enforcement officer assures an interviewee that he is not a suspect, it reframes the entire nature of the interaction. Foster maintains the interviewee has no reason to be on guard or question what information he provides to police. Moreover, he avers that without comprehending the true purpose of the interview, the interviewee is unable to make a "free and unconstrained decision" whether to confess or make an inculpatory statement. *See Nester*, 709 A.2d at 882.

---

[13] PACDL refers to our decision in *Commonwealth v. Walker*, 92 A.3d 766 (Pa. 2014). In that case, we reconsidered our prior decisions excluding expert testimony concerning eyewitness identification "in light of the magnitude of scientific understanding of eyewitness identification and marked developments in case law during the last 30 years[.]" *Id.* at 791. Abandoning our "absolute prohibition of such expert testimony[,]" we, instead, adopted a more flexible approach to give trial courts the authority to admit such testimony if it is scientifically based and relevant to the identification at issue. *Id.* at 791-792.

However, although Foster purports to apply a totality of the circumstances analysis, his argument sounds in the "but for" test that we explicitly rejected in *Nester*. *See Nester*, 709 A.2d 882 ("The question … is not whether the defendant would have confessed without the interrogation, but whether the interrogation was so manipulative or coercive that it deprived the defendant of his ability to make a free and unconstrained decision to confess."); *Yandamuri*, 159 A.3d at 136 (same); *see also Arizona v. Fulminante*, 499 U.S. 279, 285-286 (1991) (state supreme court properly applied totality of circumstances test to conclude confession was coerced and did **not** simply find that "but for the promise [of safety] given by [jailhouse informant, defendant] would not have confessed"). Foster focuses primarily on Detective Sellers' statement to him that he was not a suspect, which, he maintains, "influenced his decision to speak to police[.]" Foster's Brief at 18. While he pays lip service to the non-coercive aspects of the interview, Foster insists that his statement was involuntary because Detective Sellers explicitly told him he was not a suspect, when, in fact, the detective had applied for two warrants for his DNA. *See id.* at 23-24.

Reflecting upon the voluntariness factors,[14] we observe that even Foster concedes most of the factors weigh in favor of determining his statement was voluntary — he came to the police station willfully, was not restrained, and was permitted to leave. In addition, Foster had access to his cell phone throughout the duration of the interview, Detective Sellers was "not coercive" in his questioning, and the interview lasted only about 20 minutes. Foster's Brief at 23. Further, our review of the videotaped interview reveals nothing unusual about Foster's "physical [or] psychological state" that would have impacted his decision to speak with Detective Sellers, nor does Foster direct us to any such factors. *Yandamuri*, 159 A.3d at 525. Indeed, Foster was 37 years old at the time

---

[14] *See Yandamuri*, 159 A.3d at 525.

of the interview and appeared to have no difficulty understanding Detective Sellers. While the detective did not provide Foster with *Miranda* warnings, we emphasize that none were required since Foster was **not** in custody. *See Foster*, 301 A.3d at *7 n.3; *Yandamuri*, 159 A.3d at 519-521 (statements made while suspect was not "in custody" were "gratuitous and not subject to suppression for lack of *Miranda* warnings").

As noted above, Foster's argument primarily rests upon three factors: (1) Detective Sellers contacted him "multiple" times "to secure his presence[;]" (2) Detective Sellers applied for two search warrants for his DNA prior to the interview; and (3) after attesting in the warrant applications that he had probable cause to test Foster's DNA, Detective Sellers lied to Foster and told him he was not a suspect. Foster's Brief at 23. We conclude that these factors, neither individually nor collectively, influenced the voluntariness of Foster's statement.

Foster knew he was a witness in the sexual assault investigation. Nonetheless, Foster initially agreed to meet with Detective Sellers before failing to show up for the interview. As Detective Sellers explained at the suppression hearing, when Foster failed to call to tell the detective he was not going to appear, the detective "decided to get a search warrant for [Foster's] DNA and go out and look for him." N.T., 2/15/2022, at 8. The first search warrant application was dated October 28, 2020, and expired two days later on October 30th. Detective Sellers testified that he went to "four of [Foster's] known addresses" to try to locate him. *Id.* He left a message with one person, who apparently got in contact with Foster. Foster then arranged to come in for an interview on November 2nd. Thus, Foster's characterization of Detective Sellers' "multiple contacts … to secure his presence[,]" is misleading since the detective's multiple attempts to contact Foster were necessitated by Foster's evasive efforts themselves. Foster's Brief at 23. He also focuses on the fact that Detective Sellers applied for **two** search warrants for his DNA.

However, the second warrant was necessary only because the first warrant expired, and the probable cause affidavits supporting both warrants are identical.[15]

This brings us to the crux of Foster's claim — Detective Sellers' misrepresentation that Foster was not a suspect in the sexual assault investigation, when, in fact, the detective had applied for a search warrant to obtain Foster's DNA. To the extent Foster declares the misrepresentation was an intentional manipulation designed to extract a confession, the record supports the suppression court's explicit finding to the contrary.[16] *See* Foster's Brief at 22. The Commonwealth argued to the suppression court that the detective was not confident Foster's DNA would match the sample recovered from Victim; rather it was necessary to rule him **in or out** as a suspect. *See* N.T., 2/15/2022, at 13-16. Although the court did not agree with that characterization,[17] it stated several times that it did not believe Detective Sellers acted in bad faith or intended to mislead Foster. *See id.* at 22 ("I'm not suggesting the officer was acting in bad faith, I don't believe that. I believe in his mind [he] still didn't know" if Foster was the assailant); 30-31 ("I do not

---

[15] It is not uncommon for police to obtain a second search warrant after a first warrant has expired. Nor is it indicative of coercive behavior on the part of the police.

[16] This is not to say that the intent of the detective is germane to the question of voluntariness. In *Moran v. Burbine*, 475 U.S. 412 (1986), the United States Supreme Court considered whether a defendant's confession, made after waiving his *Miranda* rights, was nevertheless involuntary because police failed to inform him that his sister retained an attorney, who called to speak with him, but was told by police that he would not be questioned until the next day. *See id.* at 415. Recognizing the conduct of the police was "highly inappropriate," the Court concluded, however, that their "deliberate deception of an attorney could not possibly affect [the defendant's] decision to waive his *Miranda* rights unless he were at least aware of the incident." *Id.* at 423. The Supreme Court opined: "[W]hether intentional or inadvertent, the state of mind of the police is irrelevant to the question of the intelligence and voluntariness of [a suspect's] election to abandon his rights." *Id.*

[17] Specifically, the suppression court remarked: "You do not use search warrants to rule out people. You use search warrants on the representation that there is a probability that you are going to acquire useable evidence in a criminal prosecution." N,T., 2/15/2022, at 16-17.

challenge the detective's good faith. I believe he was acting in good faith based on his understanding of what was happening."); N.T., 4/18/2022, at 9 ("I didn't think the detective was conniving or maneuvering, but he was wrong. He was flat-out wrong."); 14-15 ("I don't think Detective Sellers was trying to be a wise guy, but he misunderstood what he was doing.").

Thus, we are left with a detective's non-intentional misrepresentation to an interviewee that he is not a suspect, when, in fact, the detective obtained a warrant for a sample of the interviewee's DNA to rule him in — or out — as a suspect.[18] Foster and Amicus PACDL ask this Court to adopt a blanket prohibition against any type of misrepresentation, and, in particular, that which disguises the true nature of the interview.[19] In other words, they assert Detective Sellers' misrepresentation to Foster that he was not a suspect rendered Foster's statement involuntary *per se*. While Foster professes to apply the totality of the circumstances, he insists this one factor — the misrepresentation — trumps all the others. We disagree.

---

[18] Detective Sellers' misunderstanding regarding Foster's status as a suspect is understandable considering the meager facts he provided in the warrant's probable cause affidavit. Detective Sellers averred: (1) unknown male DNA was located "in and on" Victim; (2) after interviewing Victim's friends and bar employees, he "positively identified a restaurant employee[, Foster,] that was alone with [Victim] for a period of time after she left the bar and before being found by other bar employees[;]" and (3) "because a male known to be alone with [Victim] that night has been identified, [there is a] probability that the male's DNA profile is present on swabbings of" Victim. Affidavit of Probable Cause, 10/28/2020, at 1 (unpaginated). Thus, the search warrant at issue was granted based (solely) on the fact that Foster was alone with Victim at some point during the evening when she was assaulted. Whether these facts are sufficient to support probable cause for a search warrant is not before us. Moreover, Foster ultimately consented to the buccal swab.

[19] While the studies cited by Amicus PACDL in its brief are noteworthy, they might be more persuasive here had Foster actually confessed to the crime — justifying their concern regarding false confessions — rather than denying that he had sexual intercourse with Victim.

The totality of the circumstances test remains the proper test for determining whether a defendant's statement was given voluntarily under the federal constitution. As the United States Supreme Court has explained, this analysis requires "a careful scrutiny of all the surrounding circumstances" — none of its decisions applying this test "turned on the presence or absence of a single controlling criterion[.]" *Schneckloth*, 412 U.S. at 226.

Here, when Foster agreed to meet with Detective Sellers at the police station, he was fully aware of the criminal subject of the interview. *See* Video Interview at 12:44:30-12:44:39 ("Like I told you over the phone, like right now you're not a suspect. … I'm just trying to talk to everybody that [Victim] encountered."). As Foster concedes (and our review of the video recording confirms), he was not restrained in any way, and the detective was accommodating and non-confrontational. During the interview, Foster placed himself alone with Victim for, at least, a short period of time on the night in question. Significantly, after learning Detective Sellers intended to obtain DNA samples from certain males with whom Victim had been in contact with that evening, Foster voluntarily consented to provide his DNA. He did so **before** Detective Sellers revealed a judge had approved a search warrant to obtain his DNA sample.

Despite the numerous non-coercive factors surrounding his statement to Detective Sellers, Foster insists the detective's comment at the beginning of the interview that he was not a suspect **at that time** tainted the entire conversation. We do not agree. Foster understood the purpose of the interview, and therefore, arguably understood — or should have — at the outset of the interview that he was a suspect. We should never disregard common sense in our application of the law. Indeed, Foster does not claim that he was unaware of Victim's allegation that she had been sexually assaulted. Rather, he agreed to speak with Detective Sellers, and, in fact, agreed to provide a sample of his DNA.

There is simply no support for Foster's assertion that his "capacity for self-determination was critically impaired"[20] by Detective Sellers' misrepresentation of his status as a potential suspect.[21] Nor do we find the misrepresentation "so reprehensible as to offend basic societal notions of fairness[.]" *Jones*, 322 A.2d at 126 (citations omitted). Accordingly, we agree with the determination of the Superior Court that, under the totality of the circumstances, Foster's statement to Detective Sellers was voluntarily given, and the suppression court erred in granting Foster's motion to suppress.

The United States Supreme Court has not adopted a bright-line rule regarding Fifth Amendment violations, and we, too, decline to do so. Under the Fifth Amendment, inculpatory statements made by an interviewee, not subject to a custodial interrogation, are admissible so long as they were voluntarily given. The test for voluntariness remains consideration of the totality of the circumstances surrounding the interview. *See Fulminante*, 499 U.S. at 285-286; *Yandamuri*, 159 A.3d at 525. As applied to the present matter, an officer's misrepresentation to an interviewee that he is not a suspect, when, in fact, the officer believes the interviewee may be responsible for a crime, does not so taint the interview as to render it involuntary *per se*.

Accordingly, we affirm the order of the Superior Court.

Chief Justice Todd and Justices Donohue, Dougherty, Wecht, Mundy and Brobson join the opinion.

---

[20] Foster's Brief at 15-16.

[21] *Compare Spano v. New York*, 360 U.S. 315, 323-324 (1959) (holding defendant's confession was involuntary under the totality of the circumstances, which included the fact that police had obtained grand jury indictment before interrogation; "[t]he police were not therefore merely trying to solve a crime, or even to absolve a suspect[, but] rather concerned primarily with securing a statement from defendant on which they could convict him").

Justice Wecht files a concurring opinion in which Justice Donohue joins and Justice Dougherty joins, except for footnote 4.